James Shelton and Lois Blanks, Appellees, v. James Barry and Edward Simon, Appellants.

Gen. No. 43,438.

498

Opinion filed April 24, 1946. Released for publication May 10, 1946.

Barnet Hodes, Corporation Counsel, for appellants; J. Herzl Segal, Head of Appeals and Review Division, and Sydney R. Drebin, Assistant Corporation Counsel, of counsel.

William H. Temple, of Chicago, for appellees.

Mr. Justice Burke delivered the opinion of the court.

James Shelton and Lois Blanks filed a two count complaint in the superior court of Cook county against Marvin N. Stone, James Barry, William J. O'Neill and Edward Simon. The first count charged the defendants with malicious prosecution and false imprisonment of Lois Blanks. The second count charged the defendants with false imprisonment of James Shelton. Both counts charged that the acts complained of were deliberate, wilful and malicious. Issue was joined. O'Neill was in the Army at the time of the trial and plaintiffs dismissed the case as to him. The court directed a verdict in favor of Marvin Stone. Separate verdicts were returned for James Shelton and against Barry for $750, for Shelton and against Simon for $750, for Lois Blanks and against Barry for $1,000 and for her and against Simon for $1,000. Motions by defendants for directed verdicts, for judgment notwithstanding the verdicts, for new trials and in arrest of judgment, were denied. On a remittitur of $500 by James Shelton and Lois Blanks as to each of the verdicts, separate judgments were rendered for Shelton and against Barry for $250, for Shelton and against Simon for $250, for Lois Blanks and against Barry for $500 and for her and against Simon for $500, to reverse which this appeal is prosecuted.

On Sunday, September 1, 1940 the apartment of Marvin N. Stone and family, located on the third floor

at 6917 Oglesby avenue, Chicago, was burglarized. The loot included a silver fox fur jacket, a movie camera and projector, several pieces of jewelry, including a diamond bracelet and diamond pin, several articles of lingerie, all new, some bottles of perfume, $29 in currency, a pair of men's diamond cuff links and a diamond stickpin, the aggregate value being $1,053.30. Lois Blanks came to Chicago in June 1939. From October 1939 to September 7, 1940 she was employed by the Stones as a maid. She lived at the Stone apartment. She was allowed to be off one half day every Thursday and every other Sunday. She rented a room from a cousin, Mrs. Alma Parker, at 5525 South Wabash avenue, Chicago, where she stayed on her days off. The Stone family consisted of Mr. and Mrs. Stone, their two children, then six and eight years of age, his mother-in-law Mrs. Massover, and his brother-in-law Joseph Massover. Lois Blanks had a key to the front door of the apartment. Mr. and Mrs. Stone each had a key to the apartment, as did Mrs. Massover and her son. The Stones moved into the apartment in May 1940. The people who vacated the apartment at the time the Stones moved in, turned the keys over to them. The locks then on the doors were not changed. On September 1, 1940 the Stones left the premises at about 2:00 p. m. It was Miss Blanks' day off. She was then alone in the apartment. She had a key only to the front door. She saw the Stones lock the back door before they went out. Outside of the back door there was a porch door, which could be unlocked from the inside. She left the Stone apartment between 2:15 and 2:30 p. m. She left by the front door and locked it. She went to the room she maintained at her cousin's house. When Mr. Stone returned with his family at about 5:30 that afternoon, he opened the front door with his key. He did not notice anything unusual until he walked to

the rear, when he saw the back and porch doors ajar. It became apparent that the premises had been burglarized and the police were notified.

Sergeant John N. Noonan, in charge of detectives and criminal investigation at the Woodlawn station, assigned officers O'Neill, Barry and Simon to the case. They went to the apartment and talked to Mr. Stone. They ascertained that there were no scratches on the doors, that the locks were in perfect condition, that there were no marks on the doors, and concluded that the doors had not been jimmied and that the intruder gained entrance by the use of a key. Mr. Stone took the officers through the apartment, starting with his wife's bedroom. It was a large room. In it was the bed, a dresser, with eight drawers, a chiffonier and a dressing table. He explained that in this room only two drawers had been disturbed. In one of these drawers there was some wearing apparel of Mrs. Stone, lingerie articles that she wore from day to day, and $29 in currency. This was concealed under the lingerie, as was the jewelry. The only articles taken from this drawer were the $29 in currency and three or four pieces of jewelry. In the drawer below this, Mrs. Stone had a supply of new lingerie that had never been laundered and several dozen pairs of silk hose that had never been worn. All these were missing, as were several unopened bottles of perfume. On the dressing table, undisturbed, were several bottles of perfume that had been opened. In the room occupied by Mrs. Stone's mother nothing had been taken. He then took the officers into his bedroom. Here only one drawer in the dresser had been disturbed and that was the drawer where he kept his jewelry box which had some diamond cuff links and a diamond stickpin. These were the only articles taken from this drawer. In a closet in the corner of the room, several articles of clothing were hanging, and upon a shelf of the closet

he kept a movie camera and projector. The movie camera and projector, with the articles of jewelry, were the only things taken from his bedroom. Then he took them to a closet where his wife kept her furs. This closet had two locks on it. A hole had been drilled (by the intruder) through the door of this closet and the lock jimmied off. A silver fox jacket was taken from this closet. Only the rooms of Mr. and Mrs. Stone and the fur closet had been disturbed.

Miss Blanks kept company with James Shelton. On that Sunday afternoon Miss Blanks remained at Mrs. Parker's house until Mr. Shelton called for her. They attended the theater. He then escorted her to her room in Mrs. Parker's house. Mrs. Parker then informed her of the burglary. Two men, not identified, had searched Miss Blank's room while she was absent, at which time they informed Mrs. Parker of the burglary. Miss Blanks remained there over night and reported for work at the Stone apartment at about 7:30 Monday morning, as she had been in the habit of doing. She continued as a maid in the Stone apartment until Saturday, September 7, 1940.

Sergeant Noonan did not go to the premises. He had charge of the investigation of the burglary. It appears that Anthony Favorulo, an investigator employed by a detective agency, was investigating the case for an insurance company. On Saturday, September 7, 1940, Barry, Simon and O'Neill, while patrolling in a police car, received radio instructions to report to the station. Barry was in charge of the squad. Favorulo and Sergeant Noonan were conversing. Favorulo showed Barry a report of his investigation of the Stone burglary. The report was not introduced, nor was any testimony given as to its contents. Barry testified that after reading the report, which he described as "very thorough, complete," Sergeant Noonan ordered his squad to arrest Lois Blanks, James Shelton and Thomas Ewing. They went to the

Stone apartment and arrested Lois Blanks at about
1:30 p. m. Saturday, September 7, 1940. She denied
participation in the burglary, or of knowing anything
about it. Simon remained in the squad car. Miss
Blanks was then taken to the Woodlawn police sta-
tion, where she was interrogated. She admitted that
she knew James Shelton and also that she knew
Thomas Ewing. The latter had served a term in a
penitentiary.

After questioning Miss Blanks the officers arrested
James Shelton and Thomas Ewing. They brought
these prisoners to the station for questioning. They
denied being in any way implicated in the Stone bur-
glary. After Miss Blanks was interrogated she was
told to remain behind the desk with the sergeant. She
was then taken to the police headquarters at 11th &
State streets and fingerprinted. She was placed in a
cell there until Sunday morning, when she was taken
back to the Woodlawn station. On Sunday afternoon
she was taken to the "show-up" at the police head-
quarters. She did not know the policemen who took
her back and forth between Woodlawn station and
police headquarters. On Monday, September 9, 1940
James Barry signed a complaint charging Lois Blanks
with violating a city ordinance commonly called "dis-
orderly conduct." She was specifically charged with
making or aiding in making "an improper noise, riot,
disturbance, breach of peace, or diversion tending to
a breach of the peace, within the limits of the City,"
on September 9, 1940. She was immediately released
on a $25 cash bond. She appeared in the municipal
court on the following day, where she was found not
guilty, and discharged. It is undisputed that she was
in the custody of the police at the time she was
charged with committing disorderly conduct and that
she did not commit disorderly conduct. She had not
previously been arrested or in jail.

James Shelton owned and operated a rooming house of 80 rooms at 4714 South Park avenue, Chicago. On Saturday, September 7, 1940, as he was returning to his rooming house, he was taken into custody by officers Barry, O'Neill and Simon, who were accompanied by Favorulo. They brought him to the Woodlawn police station, where he was questioned. He admitted that he knew Miss Blanks. He was then taken to Grand Crossing station and later returned to Woodlawn station. On Sunday afternoon he was taken to police headquarters, where he was fingerprinted. He was then taken before a "show-up," after which he was brought back to the Woodlawn station. He denied being implicated in any burglary. No charge was at any time placed against him. On Monday, September 9, 1940, a petition for a writ of *habeas corpus* was issued out of the criminal court, requiring the commissioner of police to bring the body of James Shelton before the court and to show by what authority he was imprisoned. Responding to the writ, the police brought him to court and, being unable to show authority for keeping him in custody, the court entered an order discharging him, whereupon he was released.

Sergeant Noonan testified that in his opinion Shelton had a bad reputation as a law abiding citizen in the community where he lived. Officer Barry testified that Miss Blanks told him she had sexual intercourse with James Shelton and Thomas Ewing. She denied that she made any such statement. Barry testified further that she told him that it would have been possible for somebody to have taken the keys out of her purse and that she drank. She denied that she drank, or that she told Officer Barry it would have been possible for somebody to have taken the keys out of her purse. She testified that when she went out she always left the keys with her cousin.

Barry testified: "In our questioning she admitted she committed adultery. She admitted she drank, she admitted that she knew Shelton had been arrested, she admitted that she knew Ewing had been in the penitentiary, she said that several times she had been with the man who had been to the penitentiary." Miss Blanks proved that she paid an attorney a fee of $25 to represent her in the disorderly conduct case and Mr. Shelton proved that he expended $15 for filing a petition for a writ of *habeas corpus* and also $50 for the services of an attorney for representing him in that proceeding.

It will be noted that James Shelton charges the defendants with false imprisonment, while Miss Blanks charges them with false imprisonment and malicious prosecution. False imprisonment consists in the unlawful restraint against his will of an individual's personal liberty or freedom of locomotion. A false arrest is one means of committing a false imprisonment. In false imprisonment malice is usually material only on the issue of damages. If the imprisonment is under legal authority, it may be malicious but it cannot be false. The wrongdoer is liable for all the direct and proximate results of the imprisonment. The plaintiff is entitled to recover such a sum as will be a fair and just compensation for the injuries sustained in the absence of circumstances justifying an award of exemplary or punitive damages. The mere unlawful detention of a person constitutes a basis of recovery of at least nominal damages. Damages for false imprisonment which are merely speculative are not recoverable. Elements of injury to the person imprisoned which are properly included in the recovery comprise injury to the person and physical suffering and humiliation, loss of time and interruption of business, reasonable and necessary expenses incurred, and injury to reputa-

tion. If the arrest is effected recklessly, oppressively, insultingly or wilfully and maliciously, with a design to oppress and injure, the jury may go beyond the rule of compensation and, as a punishment to the defendant, assess such additional (exemplary or punitive) damages as, in their discretion, they deem proper.

An officer who acts in good faith in making an arrest is absolved from punitive or exemplary damages, even though he is liable for compensatory damages. An action for malicious prosecution lies to recover damages for the institution, maliciously or without probable cause, of a suit which has terminated in favor of the defendant therein. In general, to authorize the maintenance of an action for malicious prosecution, the following elements must be shown: (1) the institution or continuation of original judicial proceedings, either civil or criminal; (2) by, or at the instance of, the defendant; (3) the termination of such proceedings in plaintiff's favor; (4) malice in instituting the proceedings; (5) want of probable cause for the proceedings; and (6) the suffering of injury or damage as a result of the action or prosecution complained of. An action for malicious prosecution is not favored in the law. *Shedd v. Patterson,* 302 Ill. 355, 359.

In the case at bar there was no proof that Edward Simon participated in the making or filing of the complaint charging Miss Blanks with disorderly conduct, or in the presentation of such complaint to the court.

Defendants complain of the 5th instruction, given at plaintiffs' request, which told the jury that if they found that defendants had not probable cause for prosecuting Lois Blanks and that they did prosecute her as charged in the complaint, "then the jury may infer malice from such want of probable cause."

508

The court erred in giving this instruction. In *Harpham v. Whitney,* 77 Ill. 32, the court was of the opinion that seven of the instructions given for the plaintiff were erroneous upon the subject of malice, as, in the 3rd, that "proof of want of probable cause is proof of malice," in the 11th, that "malice is inferred in law" from the facts therein stated, in the 15th, that, "the law imputes malice" from the circumstances therein stated, in the 19th, that, under the facts therein stated the verdict should be for the plaintiff, saying nothing whatever in regard to malice, in the 20th, that, "the law attributes malice to all persons who recklessly and without probable cause to believe him guilty, charge and prosecute another with crime," and in the 22nd, to find for plaintiff if defendants could have known he was not guilty of the charge by the exercise of that degree of care which a prudent and cautious man would have made—it not containing any requirement of malice. In that case the court said (38):

"To maintain an action for malicious prosecution, it must appear that there was not probable cause for the prosecution, and also that the defendants were actuated by malice in instituting the prosecution. There must be both want of probable cause and malice. If the law imputed malice from want of probable cause, then there would be no distinct requirement of malice, but want of probable cause would be the sole element necessary. It is often said, the jury may infer malice from the want of probable cause. They may do so under certain circumstances, but not in all cases. Malice is in no case *a legal presumption* from the want of probable cause, it being for the jury to find from the facts proved, where there was no probable cause, whether there was malice or not. 1 Hilliard on Torts, 486. And if the defendant can not justify by proof of probable cause, he may still rebut the presumption of malice by showing facts

and circumstances calculated to produce at the time, on the mind of a prudent and reasonable man, a well-grounded belief or suspicion of the party's guilt."

In *Kaley v. Hulsman*, 319 Ill. App. 219, the court said (222):

"It is also the rule that to support a case of malicious prosecution there must be both malice and want of probable cause, and these must concur. *Glenn v. Lawrence*, 280 Ill. 581, 587. And malice may not be presumed from want of probable cause if all the evidence shows there was no malice. *Hanneman v. Minneapolis, St. P. & S. S. M. Ry. Co.*, 248 Ill. App. 196."

On Monday, September 9, 1940, when Miss Blanks was charged by Officer Barry with disorderly conduct, she was immediately released upon a deposit of $25 as bail.

 Turning to a consideration of the case presented on the charge of false imprisonment, it will be observed that the police officers were acting under the direction of Sergeant Noonan, who had charge of the detectives operating out of that precinct. In addition to the information given to the police by the members of the Stone family, and the investigation conducted by the police, they were also given the result of an investigation by a private detective, Anthony Favorulo. Section 4 of Division VI of the Criminal Code of Illinois reads:

"An arrest may be made by an officer or by a private person without warrant, for a criminal offense committed or attempted in his presence, and by an officer, when a criminal offense has in fact been committed and he has reasonable ground for believing that the person to be arrested has committed it."

A criminal offense had in fact been committed, namely, burglary of a dwelling house. The pleadings

presented an issue as to whether the officers had reasonable ground for believing that the persons arrested had committed or were implicated in the commission of the burglary. In some of the cases cited by plaintiffs there was no proof that a crime had been committed. Whether such grounds existed, must be judged by the circumstances at the time of the arrest and imprisonment and does not depend upon the actual guilt or innocence of the person arrested. Those facts and circumstances should be such as would justify a careful and prudent person acting circumspectly in his belief. The remarks of our Supreme Court in the *Harpham* case, in criticising an instruction which informed the jury that "mere rumor that a person is guilty, or has been guilty, of the commission of a crime, is not sufficient to warrant the institution of a criminal prosecution, but that a party charging another with the commission of a crime, must act upon facts or circumstances within his knowledge, sufficient to induce the belief, in the mind of a cautious man, of the guilt of the person charged with crime," although the charge was malicious prosecution, are nevertheless applicable to the instant case. The court said (39):

"We regard this instruction as erroneous. There is no such doctrine of the law so in discouragement of its own enforcement, that one can so act, as in the instruction named, only upon personal knowledge, and not upon information. . . . All that is required is an honest belief, or strong ground of suspicion, of the plaintiff's guilt, and a reasonable ground of the belief or suspicion; and that may be upon information from others, as well as personal knowledge. *Murray v. Long,* 1 Wend. 140; *Bacon v. Towne et al.* 4 Cush. 217; *Foshay v. Ferguson,* 2 Denio. 617."

The parties in the case apparently assumed that the report of Favorulo would be inadmissible. We are

of the opinion that it would be part of the *res gestae*. What was developed by Favorulo would be material in determining whether the officers had reasonable ground for arresting and confining plaintiffs.

 Defendants argue that the court erred in giving the following instruction:

"The jury are instructed that in actions of this kind, if the jury find the defendants guilty under the evidence and instructions of the court, and that the plaintiffs have sustained any injury or damage by reason of the charge brought against them, then, in assessing the plaintiffs' damages, the jury are not limited to mere compensation for the actual damage sustained by them, they may award such a further sum by way of exemplary damages as the jury may believe fair in view of all the circumstances proved on the trial."

It was error to give this instruction. There was no evidence that the arrest and imprisonment of plaintiffs was effected recklessly, oppressively, insultingly, wilfully or maliciously. The record presented does not warrant the submission to the jury of an instruction which would permit the jury to impose exemplary damages. We cannot agree with plaintiffs that an instruction given for the defendants announces substantially the same rule of law as the instruction last quoted. In addition to the fact that the proof did not permit any instruction on punitive damages, this instruction is erroneous because it allows the jury to assess exemplary damages if they found defendants guilty. It ignored the rule that to be entitled to punitive damages, the imprisonment must be effected recklessly, oppressively, insultingly or wilfully and maliciously.

 The fact that Sergeant Noonan directed the defendants to arrest plaintiffs, while not a defense, is admissible as part of the circumstances in mitigation

of damages. In the case of *Johnson v. Jones,* 44 Ill. 142, an action for illegal arrest during the Civil War, the court held that while it was no bar to the action for the defendant to plead that the arrest was made under the order of President Lincoln in time of war for alleged disloyal practices of the plaintiff, yet such alleged facts could be proved in mitigation of damages and for the purpose of rebutting the presumption of malice.

Defendants also argue that the court erred in entering separate judgments against them, stating that it is a rule of law that in an action of tort against several defendants jointly the jury cannot assess damages separately against them, and that if they are to be held jointly in a joint action, there must be a single verdict against all who are responsible, followed by a judgment in a single sum. Under the Civil Practice Act either party could have moved for a severance of the actions. From the statement of facts it appears that Barry alone participated in the prosecution of the disorderly conduct case. That action was separate and distinct from the false imprisonment action. The plaintiffs were not arrested at the same time, or imprisoned for the same periods, and the amounts they paid to their attorneys varied. Where parties who have a right to request the court for a severance and a separate trial as to certain actions do not do so, they are not in a position to complain.

Because of the errors in the giving of instructions, the judgment of the superior court of Cook county is reversed and the cause remanded for further proceedings not inconsistent with the views expressed.

*Judgment reversed and cause remanded.*

KILEY, P. J., and LEWE, J., concur.