Glen Montgomery, Plaintiff-Appellee, v. John Harms
et al., Defendants. John Harms, Appellant.

Gen. No. 9,838.

Opinion filed January 19, 1953. Rehearing denied February 26, 1953. Released for publication February 26, 1953.

HERMAN H. COHN, and THOMAS W. HOOPES, both of Springfield, and HAROLD BROVERMAN, of Taylorville, for appellant.

HOGAN & COALE, of Taylorville, and LONDRIGAN & LONDRIGAN, of Springfield, for appellee.

MR. JUSTICE REYNOLDS delivered the opinion of the court.

This is an appeal from the circuit court of Christian county wherein the plaintiff-appellee (hereinafter called the plaintiff), recovered a judgment on a complaint for false arrest and malicious prosecution against the defendant-appellant (hereinafter called the defendant), John Harms for $15,000. The plaintiff obtained verdicts against the Consolidated Elevator Company and Harry Ferguson, manager of the Eleva-

tor Company in the amount of $5,000 each, but the court set aside the verdicts and rendered judgment notwithstanding the verdicts, in favor of the Elevator Company and Harry Ferguson, manager of the company.

On August 3, 1950, a person representing himself as "J. J. Blair," called at the farm equipment business of John Harms in Springfield, Illinois, and after considerable time, purchased some farm implements. He presented a check payable to "J. J. Blair" and signed by the Consolidated Elevator Company by Harry Ferguson, in the amount of $2,476.86 drawn on the Millikin National Bank of Decatur, Illinois. Harms accepted the check and was to apply $632.50 as a down payment on the implements purchased. Conditional sales contracts for the balance were executed by "J. J. Blair." Harms thereupon gave "Blair" his personal check in the sum of $1,794.36 and $50 in cash. This check was drawn on the Marine Bank of Springfield. The equipment was ordered to be delivered to the said "J. J. Blair" in about ten days at his farm near Mt. Auburn, Illinois. Harms undertook delivery of the equipment but was unable to locate anyone by the name of "J. J. Blair" in the community and thereupon made inquiry of the Consolidated Elevator Company who had purportedly given the check to "J. J. Blair," that he had received.

The man who represented himself to be "J. J. Blair," went to the Marine Bank in Springfield on the day he received defendant's check and after being described to the defendant by a teller in the bank, he was permitted to cash the check.

When the Elevator Company was contacted with reference to the whereabouts of the said "Blair," Mr. Ferguson, the manager of the company stated that he did not know anyone by that name in the community. The manager was then advised that "Blair" had been

247

given a check issued by the Elevator Company which he had used in paying for the equipment. The defendant deposited the check given to him by the man "Blair" in the Marine Bank and the same was paid by the Millikin Bank in the due course of business. On September 5th, the President of the Elevator Company informed the Millikin Bank that the check made to "Blair," was a forgery. On the same date the President of the Elevator Company and the Manager of the Elevator Company and the Auditor of the Millikin Bank, went to the Marine Bank in Springfield and from there to the place of business of the defendant. The defendant told these parties about the transaction he had had with a man named "Blair." It later developed in a conversation between the President of the Elevator Company and the auditor of the Millikin Bank that the manager of the Elevator Company had mentioned the name of Glen Montgomery, the plaintiff here, as a person who had had opportunities to take blank checks from the office of the company.

On September 8, 1950, Nalefski, the auditor of the Millikin Bank went to Springfield and in company with the defendant, went to the office of the State's Attorney where Nalefski swore to a complaint charging John Doe with obtaining from Nalefski $2,476.86 by means of the confidence game. In due course, a warrant was issued and placed in the hands of a deputy sheriff, who with Nalefski and the defendant drove to the elevator and inquired of the manager, Harry Ferguson, where Glen Montgomery could be located. The manager had made inquiry earlier in the day and gave them the probable location of Montgomery. Montgomery was located and the defendant identified him as the "J. J. Blair" that had given him the check. Montgomery was then arrested by the deputy sheriff, taken to Springfield to the county jail and from there to the office of the State's Attorney, being handcuffed to a deputy

248

sheriff while going from the jail to the State's Attorney's office. He was later returned to the jail and the next day was released on bond. He later submitted to a lie detector test, presented affidavits to the State's Attorney and brought neighbors as witnesses to establish that he was not in Springfield on the day the check was received by the defendant.

The hearing on the complaint was continued from time to time until on December 12, 1950, when the complaint was dismissed on motion of the State's Attorney, for lack of evidence.

Montgomery testified that he had expended $250 in defending the charge as well as losing some ten to fifteen days time when he was making from $20 to $40 a day. He testified further that he was a special deputy sheriff and was vice president of the Anti-thief Association. He was still holding these positions at the time of the dismissal of the complaint.

The motion for a directed verdict at the close of the plaintiff's evidence and again at the close of all of the evidence and a motion for judgment notwithstanding the verdict and for a new trial were all denied.

 At the outset, it must be remembered that the defendant, Harms, did not make any complaint to the State's Attorney or any other officer relative to this case; that he, in fact, was not damaged but profited by the amount of the difference of his check and the check he received. It must be remembered that there is no evidence of any act by the defendant Harms, to cause the arrest or prosecution of the plaintiff Montgomery. It is true that the defendant did identify the plaintiff as the man that gave him the check. The plaintiff was permitted to prove the extent and amount of the property of the defendant, on the theory that he had maliciously caused the arrest and imprisonment of the plaintiff and consequently was liable for exemplary or punitive damages. In *Shelton v. Barry,* 328 Ill. App.

497, at page 506, the court said: "False imprisonment consists in the unlawful restraint against his will of an individual's personal liberty or freedom of locomotion. A false arrest is one means of committing a false imprisonment. In false imprisonment malice is usually material only on the issue of damages. If the imprisonment is under legal authority, it may be malicious but it cannot be false. The wrongdoer is liable for all the direct and proximate results of the imprisonment. The plaintiff is entitled to recover such a sum as will be a fair and just compensation for the injuries sustained in the absence of circumstances justifying an award of exemplary or punitive damages. The mere unlawful detention of a person constitutes a basis of recovery of at least nominal damages. Damages for false imprisonment which are merely speculative are not recoverable. Elements of injury to the person imprisoned which are properly included in the recovery comprise injury to the person and physical suffering and humiliation, loss of time and interruption of business, reasonable and necessary expenses incurred, and injury to reputation. If the arrest is effected recklessly, oppressively, insultingly or wilfully and maliciously, with a design to oppress and injure, the jury may go beyond the rule of compensation and, as a punishment to the defendant, assess such additional (exemplary or punitive) damages as, in their discretion, they deem proper." . . . "An action for malicious prosecution lies to recover damages for the institution, maliciously or without probable cause, of a suit which has terminated in favor of the defendant therein. In general, to authorize the maintenance of an action for malicious prosecution, the following elements must be shown: (1) the institution or continuation of original judicial proceedings, either civil or criminal; (2) by, or at the instance of, the defendant; (3) the termination of such proceedings in plaintiff's favor; (4) malice in instituting the

250

proceedings; (5) want of probable cause for the proceedings; and (6) the suffering of injury or damages as a result of the action or prosecution complained of. An action for malicious prosecution is not favored in the law. *Shedd v. Patterson*, 302 Ill. 355, 359.''

 The evidence is clear that the defendant had no acquaintance or relationship whatsoever with the plaintiff prior to this transaction. The defendant had not been damaged and it would be beyond the stretch of human imagination to infer that he was actuated by any malicious intent. ''And malice may not be presumed from want of probable cause if all the evidence shows there was no malice.'' *Hanneman v. Minneapolis, St. P. & S. S. M. Ry. Co.*, 248 Ill. App. 196.

 The plaintiff contends that the defendant is guilty of malicious prosecution. It would be a harsh rule that would hold a citizen guilty of malicious prosecution in causing the arrest and imprisonment of a person simply on the basis of mistaken identification, when there is no other evidence whatsoever on which to base it. If such were the rule, the plaintiff would be entitled to punitive damages, even though the defendant had acted in the best of faith as a good and law-abiding citizen. Such a rule would deter the prosecution in all criminal cases to such an extent that it would be almost impossible to have a witness identify a criminal suspect for fear that he might be in error and be liable for punitive or exemplary damages.

 The jury in this case returned separate verdicts against three different defendants. The defendants had all been sued jointly as tort-feasors. In a very recent case, *Aldridge v. Fox*, 348 Ill. App. 96, at page 102, the court states: ''. . . it has long been the law in this State a jury may not apportion damages among joint tort-feasors.'' The total amount of the verdicts against all of the defendants aggregates

$25,000. This is clearly excessive and warrants reversal and remandment of this cause.

The judgment of the circuit court is reversed and the cause remanded.

*Reversed and cause remanded.*