THE VILLAGE OF BELLWOOD BOARD OF FIRE AND POLICE COMMISSIONERS, Petitioner, v. THE HUMAN RIGHTS COMMISSION *et al.*, Respondents.

First District (3rd Division)   No. 1—88—2081

Opinion filed June 28, 1989.

Staehlin, Jantorni & Sullivan, of Chicago (John M. Sullivan and Susan L. Jantorni, of counsel), for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Bret A. Rappaport, Assistant Attorney General, of Chicago, of counsel), for respondent Human Rights Commission.

Paul J. Morency and Elizabeth M. Streit, both of Mayer, Brown & Platt, of Chicago, for respondent Craig Kincaid.

JUSTICE McNAMARA* delivered the opinion of the court:

Petitioner, Village of Bellwood Board of Fire and Police Commissioners (Bellwood), appeals from the orders of the Illinois Department of Human Rights (Commission) finding that respondent, Craig Kincaid, proved his allegations of racial harassment and discriminatory discharge and ordering that Bellwood pay back pay, damages, attorney fees, and costs. Bellwood initially maintains that the Commission lacked authority to review its final decision to terminate the employment of a probationary police officer. Bellwood contends that in the event the Commission's review was proper, the decision of the Board must be upheld unless it is against the manifest weight of the evidence; that the findings that Kincaid was subject to racial harassment and that his discharge was racially motivated are against the manifest weight of the evidence; that the award of $10,000 in damages for emotional suffering was erroneous; and that the Commission abused its discretion in awarding attorney fees and costs.

On May 10, 1982, Kincaid filed a charge of discrimination with the Commission against the Bellwood board, alleging racial discrimination in his discharge as a probationary police officer. Kincaid's charge was

---

*Justice McNamara participated in this opinion prior to his assignment to the Sixth Division.

based on the following facts. Kincaid, a black male, was hired by Bellwood in March 1981, to serve as a probationary patrolman. He completed his preliminary training and began on June 11, 1981.

The probationary period in the Bellwood police department is one year. During that time, probationary officers receive on-the-job training from experienced sergeants and patrolmen. Lieutenants and sergeants solicit reviews from these supervising officers and incorporate them with their own observations into periodic written evaluations. The chief of police reviews the evaluations. If the probationer is working satisfactorily, he will be retained automatically and will become a full-time officer at the end of the probationary year.

At the time Kincaid began his probationary period, he was the second black police officer to join the department. The first officer, Jesse Williams, was hired in 1978 and successfully completed his probationary year.

Williams testified that when he arrived on the force in 1978, many of the officers refused to speak to him. During his probationary year, he heard various officers telling racially derogatory jokes. He did not report these incidents to his superiors. Williams also testified that twice during his probationary year, he found racially derogatory materials in his mailbox at the department. The materials were entitled "Nigger Application for Employment" and made numerous racial slurs. Again, he did not report these incidents to his superiors. Chief of Police Eastham testified, however, that he was aware of the circulation of such materials.

Kincaid testified that when he arrived on the force in 1981, he was subjected to numerous racial slurs. He stated that racially derogatory materials circulated around the department on a regular basis. Offensive cartoons routinely were tacked on bulletin boards in the roll-call room. These cartoons depicted blacks in various degrading situations. One such cartoon showed a black man discovering his wife making love with a cockroach. Kincaid indicated that several white officers watched him when he encountered such cartoons and laughed at his reaction to them. Furthermore, on at least one occasion, a racially derogatory poster was displayed in the locker room. The poster, approximately two feet by three feet in size, advertised a movie entitled "Ragtime." The words "lock the nigger up" and "one less nigger off the street" had been written on the poster in large letters. New captions derogatory to blacks were added on succeeding days. Supervising officers read these captions aloud and laughed at them in Kincaid's presence. Kincaid complained about the poster to his supervisors and asked that it be removed on two separate occasions. The

poster remained on display for a week or more after Kincaid's complaints.

Kincaid additionally testified that the white officers with whom he was supposed to train refused to speak to him and that a number of these officers freely engaged in jokes and slurs derogatory to blacks. One sergeant in particular was especially active in the use of these comments. This officer periodically interrupted other sergeants or lieutenants who were conducting roll call to insert racially derogatory jokes.

Kincaid intimated that the racial slurs pervaded his working environment. One of the officers with whom he frequently rode, and who was supposed to be training him, made the statement that "all blacks look alike" and that he would "like to bash their heads in."

Kincaid complained to his supervising officers about the racially derogatory jokes, comments, cartoons and poster. One supervising officer told Kincaid that he had been afraid that something like this would happen and that he would have preferred to hire a Mexican rather than another black. This officer, however, took no action to stop the harassment.

In the fall of 1981, Sergeant Howard had the opportunity to evaluate Kincaid. Howard's evaluation of Kincaid was very favorable. He indicated that at that time it was his belief that Kincaid would make a very good police officer. Howard testified, however, that Kincaid's attitude and performance deteriorated in the period subsequent to that evaluation. Other officers also had the opportunity to evaluate Kincaid in the fall of 1981. The majority of these evaluations reflected that the reviewing officers believed that Kincaid had an attitude problem; that he displayed a lack of enthusiasm for his job; that he was unable to learn how to accomplish various tasks such as filling out police reports and performing desk duty when called upon to do so; and that he displayed racial prejudice in that he favored blacks over whites. The testimony of various of these officers corroborated what they had stated in the evaluations.

Upon receipt of these evaluations, Kincaid protested to Chief Eastham that these evaluations were not accurate. Kincaid indicated that he believed he was the victim of racial discrimination. Eastham responded that Kincaid had to lodge these complaints with the evaluating officers.

Kincaid testified that he attempted to determine the reasons for the untrue evaluations. When confronted, Sergeant Mangano told him that he would just have to "take it." Sergeant DeBaro refused to speak to him at all. Kincaid again appealed to Eastham regarding the

evaluations. Eastham indicated that he had read the evaluations and warned Kincaid that he needed to improve the evaluations or he would not become a permanent member of the department. Eastham did not discuss what aspects of Kincaid's performance needed improvement. In the past, when white probationary officers were perceived to be in trouble, they received citations, warnings, suspensions, and counseling prior to a termination decision being rendered.

Eastham testified on behalf of Bellwood. He stated that in October or November of 1981, he had the opportunity to review Kincaid's evaluations. He stated that when Kincaid approached him to discuss the evaluations, he told Kincaid that pursuant to department procedures, Kincaid first would have to speak to the evaluating officers. Eastham testified that this was the regular procedure to be followed for lodging complaints even when the complaint is about the evaluating officer.

Eastham testified that he next had the opportunity to review Kincaid's evaluations in December 1981. At that time, Eastham told Kincaid the evaluations were poor and that if Kincaid did not improve his performance in the next three months, he would recommend termination. Eastham stated that as of December 1981, he had not received any complaints from Kincaid regarding unfair treatment, nor had he heard about any complaints of racial discrimination from the sergeants or lieutenants. Furthermore, Eastham stated that although he rarely went into either the roll-call room or the locker room, on those occasions when he did, he did not see any cartoons or posters.

On March 17, 1982, Eastham recommended to the Bellwood board that Kincaid's employment be terminated prior to the end of his probationary year. The board informed Kincaid that his employment was terminated effective March 19, 1982. Subsequently, the board recalled Robert Johnston, a white male, from layoff status. Eastham testified that prior to Johnston's layoff, he had received very poor evaluations and likely would have been terminated.

After a hearing, the administrative law judge (ALJ) found in favor of Kincaid. Bellwood filed a statement of exceptions and request for oral argument before the Commission. The Commission, with minor alterations, adopted the order and decision of the ALJ.

Bellwood first contends that the Commission has no legal authority to review its final decision to terminate the employment of a probationary police officer. Bellwood claims that Kincaid's proper recourse was review under the Administrative Review Law (Ill. Rev. Stat. 1981, ch. 110, par. 3—101 *et seq.*). Kincaid counters that Bellwood has waived its right to raise this issue by its failure to file a

motion to dismiss Kincaid's complaint and by its failure to raise the issue in its statement of exceptions.

We believe Bellwood sufficiently raised the issue by challenging the authority of the Commission to review the board's decision in its various pleadings and motions before the Commission. Moreover, the Commission addressed the issue in its decision. Accordingly, we will address the issue that Kincaid should have sought review under the Administrative Review Law.

There is no dispute that Bellwood is subject to the Illinois Municipal Code (Code) (Ill. Rev. Stat. 1981, ch. 24, par. 1—1—1 *et seq.*). The Municipal Code provides for the establishment of the board of fire and police commissioners (Ill. Rev. Stat. 1981, ch. 24, par. 10—2.1—1), and grants the board the exclusive authority to appoint all members of the police department (Ill. Rev. Stat. 1981, ch. 24, par. 10—2.1—4), and to make all rules for appointments and removal (Ill. Rev. Stat. 1981, ch. 24, par. 10—2.1—5). The Code further provides for specific procedures in the event removal or discharge of an officer or member is sought. (Ill. Rev. Stat. 1981, ch. 24, par. 10—2.1—17.) Judicial review of the final administrative decisions of the board is governed by the Administrative Review Law. An administrative decision is one rendered by any administrative agency which affects the legal rights, duties or privileges of parties and which terminates the proceedings before the administrative agency. Ill. Rev. Stat. 1981, ch. 110, par. 3—101.

The Illinois Human Rights Act (HRA) vests the Human Rights Commission with exclusive jurisdiction to adjudicate cases brought pursuant to the HRA. (Ill. Rev. Stat. 1981, ch. 68, par. 8—111(D).) It is clear that the HRA, which contains a comprehensive scheme of remedies and administrative procedures, is meant to be the exclusive source for redress of civil rights violations. (See *Mein v. Masonite Corporation* (1985), 109 Ill. 2d 1, 485 N.E.2d 312; *Thakkar v. Wilson Enterprises, Inc.* (1983), 120 Ill. App. 3d 878, 458 N.E.2d 985; *Armstrong v. Freeman United Coal Mining Co.* (1983), 112 Ill. App. 3d 1020, 446 N.E.2d 296.) Moreover, the HRA gives the Commission subject matter jurisdiction concerning claims of unlawful discrimination by employers because of race. (Ill. Rev. Stat. 1985, ch. 68, pars. 1—102(A), 1—103(D), 2—102(A), 7—101(B).) Accordingly, the issue which we must consider is whether the Commission has the legitimate authority to proceed on Kincaid's discrimination complaint.

In support of its contention that the Commission does not have the legitimate authority to proceed, Bellwood relies on this court's decision in *Board of Trustees of the Police Pension Fund v. Human*

*Rights Comm'n* (1986), 141 Ill. App. 3d 447, 490 N.E.2d 232. In *Urbana*, the court carved out a narrow exception to the Commission's authority to consider civil rights violations. Complainant, an insulin-dependent diabetic, applied to participate in the Police Pension Fund of Urbana. After complainant's appointment as a policeman for the city, the board of the Police Pension Fund held a hearing on his application to participate in the fund. The board denied complainant's application, noting that he could become disabled, and thus eligible for disability benefits, at any time.

Complainant in *Urbana* filed a charge of handicap discrimination with the Commission. The board filed a motion to dismiss the complaint alleging that the Commission did not have jurisdiction or authority to decide the issue. The Commission denied the board's motion to dismiss. The board then filed a complaint in the circuit court seeking an order of prohibition to prevent the Commission from proceeding on the discrimination complaint. The trial court dismissed the complaint. On appeal, this court reversed and remanded with directions to enter an order of prohibition. The court noted that the Commission had subject matter jurisdiction over the claim, but that the Illinois Pension Code (Ill. Rev. Stat. 1985, ch. 108½, par. 1—101 *et seq.*), which gave the board the exclusive power and duty to manage the pension fund, implicitly vested the board with jurisdiction over the subject matter of certain alleged civil rights violations. The court noted that the board necessarily was required to consider an applicant's medical condition because it was vested with the exclusive authority to determine eligibility to participate in the fund; the primary reason for denying an application to participate in the fund is medical problems. Because the board was vested with authority over such matters, the court found that the provisions of the Illinois Pension Code which grant such authority were a legal exception to the exclusivity provisions of the HRA. *Board of Trustees of the Police Pension Fund v. Human Rights Comm'n*, 141 Ill. App. 3d 447, 490 N.E.2d 232; Ill. Rev. Stat. 1981, ch. 108½, par. 3—132; Ill. Rev. Stat. 1981, ch. 68, par. 8—111(D).

The Bellwood board, however, is vested with no such authority. The Municipal Code, which governs the board, does not grant it the *exclusive* power and duty to manage the policy department. Moreover, the board's decisions do not of necessity include consideration of matters within the jurisdiction of the Commission. Thus, there is nothing in the Municipal Code which conflicts with the exclusive authority of the Commission to hear matters involving civil rights violations.

■ Furthermore, although the Municipal Code provides for ad-

ministrative review of all final decisions of the board (Ill. Rev. Stat. 1981, ch. 24, par. 10—2.1—17; *People ex rel. Smith v. Board of Fire & Police Commissioners* (1977), 51 Ill. App. 3d 221, 366 N.E.2d 554), we do not believe that this provision bars access to the Commission. The Administrative Review Law provides as follows:

"[T]his Act shall apply to and govern every action to *review judicially* a final decision of any administrative agency \*\*\*." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 110, par. 3—102.)

Thus, if an individual seeks *judicial review* of an administrative decision subject to the Administrative Review Law, his only recourse is to that act. We, however, do not construe the filing of a petition with the Commission as an action to review *judicially* a decision of an administrative agency. (See *Johnson v. Human Rights Comm'n* (1988), 173 Ill. App. 3d 564, 527 N.E.2d 883 (noting that the HRA in general, and article 8 specifically, differentiates between the courts of our judicial system and the Commission). See also *City of Cairo v. Fair Employment Practices Comm'n* (1974), 21 Ill. App. 3d 358, 315 N.E.2d 344.) Rather, we construe the filing of such a petition as a separate action specifically authorized by the HRA.

■ Moreover, the interpretation which is suggested by Bellwood would contravene legislative intent by barring certain government employees from seeking redress under the provisions of the HRA. We do not believe the legislature intended to bar access to that remedy when a governmental administrative body has committed an unfair employment practice. Accordingly, we find that the Commission had the authority to consider Kincaid's charge of discrimination against Bellwood.

Bellwood next contends that the ALJ improperly applied a preponderance of the evidence standard of review when considering Kincaid's charge of discrimination. Bellwood asserts that the decision of its board must be upheld unless it is against the manifest weight of the evidence.

■ Bellwood correctly states that a court's scope of review of an administrative agency's decision regarding discharge is a two-step process. First, the court must determine whether the agency's findings of fact are contrary to the manifest weight of the evidence. Second, the court must determine whether the findings of fact provide a sufficient basis for the agency's conclusion that cause for discharge does or does not exist. (*Department of Mental Health & Developmental Disabilities v. Civil Service Comm'n* (1981), 85 Ill. 2d 547, 426 N.E.2d 885.) As we have indicated, however, a proceeding pursuant to the HRA is not equivalent to judicial review of a decision of an ad-

ministrative agency. It is an entirely separate proceeding, governed by the statutory parameters of the HRA.

The HRA provides that after the taking of all testimony in an HRA proceeding, the hearing officer shall determine whether a civil rights violation has occurred based upon a preponderance of the evidence. (Ill. Rev. Stat. 1981, ch. 68, par. 8—106(F)(1).) The findings and recommended order of the hearing officer are then reviewed by the Commission. (Ill. Rev. Stat. 1981, ch. 68, par. 8—107(E)(1).) The Commission must adopt the hearing officer's findings if they are not contrary to the manifest weight of the evidence. (Ill. Rev. Stat. 1981, ch. 68, par. 8—107(e)(2).) Thus, we find that the ALJ correctly used the preponderance standard when considering Kincaid's charge of discrimination.

Bellwood next contends that the Commission's findings that Kincaid was subject to racial harassment, that the reasons articulated by Bellwood for Kincaid's discharge are pretextual, and that Kincaid's discharge was racially motivated are against the manifest weight of the evidence.

■ Initially we note that under the HRA, the Commission's findings of fact shall be sustained unless the court determines that such findings are contrary to the manifest weight of the evidence. (Ill. Rev. Stat. 1981, ch. 68, par. 8—111(A)(2).) Moreover, judicial review under the HRA is to be in accordance with the provisions of the Administrative Review Law (Ill. Rev. Stat. 1981, ch. 68, par. 8—111(A)(1).) Under the Administrative Review Law, the agency's findings of fact shall be held to be *prima facie* true. (Ill. Rev. Stat. 1981, ch. 110, par. 3—110.) The decision of the administrative agency is not to be overturned unless contrary to the manifest weight of the evidence. *Loyola University v. Human Rights Comm'n* (1986), 149 Ill. App. 3d 8, 500 N.E.2d 639.

■ The HRA prohibits any employer from making employment decisions on the basis of "unlawful discrimination." (Ill. Rev. Stat. 1981, ch. 68, par. 2—102(A).) "Unlawful discrimination" is defined to include discrimination against a person because of his or her race. (Ill. Rev. Stat. 1981, ch. 68, par. 1—103(Q).) In analyzing claims of discrimination under the HRA, Illinois courts have looked to the standards applicable to analogous Federal claims. (*Valley Mould & Iron Co. v. Human Rights Comm'n* (1985), 133 Ill. App. 3d 273, 478 N.E.2d 449.) Initially, the employee has the burden of proving by a preponderance of the evidence a *prima facie* case of unlawful discrimination. This creates a rebuttable presumption. (*Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 67 L. Ed. 2d 207, 101 S.

Ct. 1089.) The employer then must clearly set forth a legitimate, non-discriminatory reason for its employment decision to successfully rebut the presumption of unlawful discrimination. (*Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089.) If the employer is successful, the presumption of unlawful discrimination no longer is present in the case. (*Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089.) The employee then must prove by a preponderance of the evidence that the legitimate reason offered by the employer was not the true reason underlying its employment decision and that it is only a pretext. This burden merges with the employee's ultimate burden of proving whether the employer engaged in unlawful discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089; *Village of Oak Lawn v. Human Rights Comm'n* (1985), 133 Ill. App. 3d 221, 478 N.E.2d 1115.

Thus, our initial determination must be whether the Commission's decision that Kincaid had established a *prima facie* case of discrimination by a preponderance of the evidence is contrary to the manifest weight of the evidence. We believe the Commission's decision was correct.

Kincaid has alleged that he suffered discrimination based on race, that he was the victim of racial harassment and that his discharge was racially motivated. We first will discuss Kincaid's claim of racial harassment.

■ Racial harassment has been defined to include a steady barrage of opprobrious racial comment. (*Johnson v. Bunny Bread Co.* (8th Cir. 1981), 646 F.2d 1250.) More than a few isolated incidents of harassment, however, must have occurred; racial comments that are merely part of casual conversation, are accidental, or are sporadic do not trigger civil rights protective measures. (*Equal Employment Opportunity Comm'n v. Murphy Motor Freight Lines, Inc.* (D. Minn. 1980), 488 F. Supp. 381.) Moreover, the employer is not automatically liable for the harassment of its employees. (See generally *DeGrace v. Rumsfeld* (1st Cir. 1980), 614 F.2d 796; *Equal Employment Opportunity Comm'n v. Murphy Motor Freight Lines, Inc.,* 488 F. Supp. 381.) Nonetheless, an employer may not stand by and allow an employee to be subjected to a course of racial harassment by co-workers; an employer must accept responsibility for its supervisors' derelictions in responding to racial problems. *DeGrace v. Rumsfeld,* 614 F.2d 796.

■ Here, the ALJ heard the conflicting evidence offered by the parties and found that there was a pervasive, hostile working environment for black officers in Bellwood's employ. The first black officer on

the force found documents labeled "Nigger Application for Employment" in his mailbox at the police station. The chief of police was aware of these documents but took no action. Moreover, racially derogatory cartoons frequently were posted on the bulletin boards in the roll-call room. These cartoons were in the plain sight of the chief of police and other supervisory officers, but no action was taken. Additionally, a poster with racially derogatory comments written on it was displayed for several weeks in the locker room. Despite Kincaid's complaints, the poster remained up.

The ALJ found that the racially hostile atmosphere prevented Kincaid from getting needed guidance from his fellow officers. It was the duty of Bellwood's patrolmen and officers to teach police skills to probationary officers. Nonetheless, several white members of the police force refused to ride with Kincaid. The ALJ also found that Kincaid was denied credit for arrests, with this credit instead being given to white officers. Finally, the ALJ determined that Kincaid received unjustly poor evaluations from three sergeants because of his race. The ALJ noted that despite Kincaid's complaints to Eastham about these evaluations, Eastham took no action. The ALJ concluded that the racially charged atmosphere at the Bellwood police department amounted to racial harassment, and thus, constituted discrimination based upon race within the meaning of the HRA.

We have reviewed the record and find that there is adequate support for the ALJ's conclusions. Kincaid was subjected to a continuous stream of racially derogatory comment, in one form or another, from the officers at the Bellwood police department. The supervising officers were aware of the problem, but took no action to correct it, and, in fact, on some occasions contributed to it. We believe this is exactly the type of racial harassment which the HRA seeks to prevent.

Kincaid's inability to recall specifically the jokes which he heard or the details of the cartoons which were posted does not defeat his claim that he was the victim of racial harassment. Nor does the fact that the cartoons were not posted on a daily basis or that the offensive "Ragtime" poster eventually was removed mitigate the racially hostile atmosphere engendered by their presence. Finally, we are unpersuaded by Bellwood's claim that racial discrimination cannot be found where a black officer, Williams, did successfully complete the probationary period. Williams testified that he chose not to report the racially derogatory comments which he heard. Moreover, Williams had the benefit of several years' experience with a different police department. The Bellwood officers' "silent treatment" of Williams did not substantially impair his ability to become a capable police officer. Wil-

liams' tolerance of the racially derogatory atmosphere does not alone disprove Kincaid's allegations that the atmosphere was discriminatory.

As the Commission noted in its order and decision, resolution of this case turned on a determination of credibility. We believe the ALJ was in the best position to evaluate the credibility of the witnesses. If the issue before the trier of fact turns on conflicting testimony and the credibility of witnesses, its determination should be sustained. (*Brewington v. Illinois Department of Corrections* (1987), 161 Ill. App. 3d 54, 513 N.E.2d 1056.) The ALJ chose to accept Kincaid's version of the facts, and we do not believe that decision is contrary to the manifest weight of the evidence. Thus, Kincaid established a *prima facie* case by establishing by a preponderance of the evidence that Bellwood engaged in racial harassment.

■■■ We additionally believe that Kincaid sufficiently proved a *prima facie* case of discrimination based on racially motivated discharge. A *prima facie* case of discrimination based on race may be established by showing that similarly situated employees of a different race were treated more favorably. (*McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817.) What constitutes that *prima facie* case will vary according to the specific claim. (*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817.) We are not concerned with the harshness of the discipline in itself; rather, we are concerned with whether the discipline was harsher than that imposed on comparable persons of other races. An employer cannot impose different standards of discipline on different races. *Loyola University v. Human Rights Comm'n*, 149 Ill. App. 3d 8, 500 N.E.2d 639.

■■■ Here, Kincaid established that he received disparate treatment from Bellwood. Kincaid was discharged without previous suspension and without any counseling regarding improving his performance. The testimony of various officers established that white officers who were discharged from their probationary positions were given counseling and suspensions before a final determination regarding termination was rendered. In fact, during Eastham's tenure as chief of police, there had been only three probationary officers other than Kincaid who failed to pass their probationary period, and each of them was treated more favorably then Kincaid before a decision was made to discharge the officer. Thus, Kincaid established a *prima facie* case of racially motivated discharge by proving by a preponderance of the evidence that he is a member of a protected class who was disciplined in a harsher manner than comparably situated persons of a different race. See *Loyola University v. Human Rights Comm'n*, 149 Ill.

App. 3d 8, 500 N.E.2d 639.

Bellwood claims to have discharged Kincaid for poor report-writing skills, poor attitude toward the public and other officers, inability to find the streets in Bellwood, and inability to perform desk duties. Consequently, Bellwood has successfully articulated a legitimate, reasonable explanation for its discharge of Kincaid and, therefore, has successfully rebutted the presumption of discrimination.

■ At this point, Kincaid must show that Bellwood's stated reasons for discharging him are pretextual. Pretext can be demonstrated by showing that a discriminatory motive likely influenced the employer or that the reasons stated by the employer are incredible. (*Board of Education v. Illinois Human Rights Comm'n* (1985), 135 Ill. App. 3d 206, 481 N.E.2d 994.) We briefly will address each of Bellwood's stated reasons.

■ Bellwood claimed that Kincaid was incapable of writing reports which met the department's standards. Kincaid testified that he rewrote several reports and received compliments on his improved writing skills. After the fall of 1981, Kincaid was not asked to rewrite any report which he filed. It is apparent, therefore, that his report-writing skills had improved to an acceptable level. Moreover, the evidence demonstrated that many members of the department had experienced problems with report writing.

Bellwood also stated that Kincaid was discharged because of his inability to locate streets in Bellwood. Kincaid admitted that when he first started riding in a patrol car, he was not familiar with some of the remote side streets. Nonetheless, when Lieutenant Howard rode with Kincaid, he noted no inefficiency in this area of Kincaid's performance. Moreover, Kincaid regularly was assigned to ride alone in a patrol car as early as September 1981. It is the policy of Bellwood to prohibit assigning a patrolman to ride alone if that patrolman is not capable of handling the job. Thus, it is reasonable to conclude that Kincaid's knowledge of the streets of Bellwood was acceptable.

Bellwood additionally indicated that Kincaid often displayed a poor attitude toward the public in that he discriminated on the basis of race when he made traffic stops and when conducting other police business. Kincaid was assigned to patrol a predominantly white area of Bellwood and, accordingly, the majority of his traffic tickets were written for white people. Kincaid used a radar detection system to make many of these traffic stops and could not have detected race when making his initial stop.

Bellwood finally asserted that Kincaid was unable to perform desk duties when required to do so. This inability, however, was mentioned

only twice in Kincaid's written evaluations. Kincaid testified that although he had a few difficulties with desk duties when he first was assigned to the task, he learned the job and was able to handle desk duty as well as any other patrolman.

We believe that Kincaid has adequately refuted each reason articulated by Bellwood. We find that the Commission could reasonably conclude that the ALJ's finding of pretext was not contrary to the manifest weight of the evidence.

Moreover, we believe that Kincaid has sustained his overall burden of establishing that Bellwood engaged in unlawful discrimination. The record amply reflects an atmosphere charged with racism, ultimately resulting in the racially motivated discharge of Kincaid.

Bellwood finally challenges the propriety of the Commission's award of damages in the amount of $10,000, attorney fees in the amount of $57,457.60, and costs in the amount of $3,318.37.

■■ We first will address the Commission's award of damages. Absent an express grant of power, an administrative agency has no power and may not determine damages and award a personal money judgment therefor. (1 Am. Jur. 2d *Administrative Law* §184, at 988 (1962). See, *e.g.*, *Zurek v. Cook County Police & Corrections Merit Board* (1976), 42 Ill. App. 3d 1044, 356 N.E.2d 1079.) The HRA provides that upon finding a civil rights violation, the Commission may direct the respondent to pay actual damages for injury or loss suffered by the complainant. (Ill. Rev. Stat. 1981, ch. 68, par. 8—108(B).) Although Illinois courts have not directly addressed the issue of the propriety of awarding compensation for nonpecuniary harm in civil rights cases, the language of the statute would seem to permit such damages. Illinois courts have long recognized that actual damages may include compensation for mental suffering. See, *e.g.*, *Knierim v. Izzo* (1961), 22 Ill. 2d 73, 174 N.E.2d 157 (damages recoverable for mental anguish occasioned by death threat); *Lorillard v. Field Enterprises, Inc.* (1965), 65 Ill. App. 2d 65, 213 N.E.2d 1 (actual damages in libel action included damages for mental suffering); *Shelton v. Barry* (1946), 328 Ill. App. 497, 66 N.E.2d 697 (damages for humiliation recoverable in action for false imprisonment).

■■ Moreover, courts in other States with civil rights legislation similar to that found in Illinois have awarded compensation for such harm. (See, *e.g.*, *Buckley Nursing Home, Inc. v. Massachusetts Comm'n Against Discrimination* (1985), 20 Mass. App. 172, 478 N.E.2d 1292 (Massachusetts); *Joplin v. Missouri Comm'n on Human Rights* (Mo. 1982), 642 S.W.2d 370 (Missouri); *Rogers v. Campbell Foundry Co.* (1982), 185 N.J. Super. 109, 447 A.2d 589 (New Jersey);

*State Division of Human Rights v. State* (1982), 90 A.D.2d 51, 456 N.Y.S.2d 63 (New York); *Fred Meyer, Inc. v. Bureau of Labor* (1979), 39 Or. App. 253, 592 P.2d 564 (Oregon).) Additionally, Federal courts considering analogous claims have awarded such damages. (See, *e.g.*, *Hunter v. Allis-Chalmers Corp.* (7th Cir. 1986), 797 F.2d 1417; *Carter v. Duncan-Huggins, Ltd.* (D.D.C. 1984), 727 F.2d 1225.) In view of these decisions and our own jurisprudence in the area of damages, we find that the term "actual damages" in the context of the HRA contemplates compensation for emotional harm and mental suffering caused by a violation of the HRA. We caution, however, that an award of damages under such circumstances must be kept within reasonable parameters.

██ We find that the $10,000 award here was not unreasonable. The conduct demonstrated was opprobrious, continuous, and outrageous. The Commission had ample evidence before it to show that Kincaid was deprived of employment and sustained much emotional harm as a result of that conduct. Accordingly, we hold that the award of $10,000 was not excessive, and we will not disturb it.

Bellwood finally contends that the Commission erred in its award of attorney fees and costs. Bellwood maintains that the hourly rate charged by Kincaid's attorney is excessive based upon the prevailing market rates in the relevant community.

██ The HRA provides that, upon the finding of a civil rights violation, the Commission may order the respondent to pay to the complainant all or a portion of the costs of maintaining the suit, including reasonable attorney fees. (Ill. Rev. Stat. 1983, ch. 68, par. 8—108(G).) A reviewing court will not vacate an award of attorney fees absent a showing of abuse of discretion in making the award. *Loyola University v. Human Rights Comm'n*, 149 Ill. App. 3d 8, 500 N.E.2d 639; *Lurie v. Canadian Javelin Ltd.* (1982), 93 Ill. 2d 231, 443 N.E.2d 592.

██ Here, Kincaid's counsel provided competent evidence of its actual rate as well as the actual hours which it devoted to this case. Bellwood's counsel provided evidence of countervailing market rates. The ALJ considered this evidence and, after certain adjustments, awarded Kincaid's counsel the requested fees. The Commission found that the amount which the ALJ ordered Bellwood to pay to Kincaid for his attorney fees is not unreasonable. In view of the success of the claim, the benefit to Kincaid, and the nature of the controversy, we believe the Commission's award of fees was proper. We agree with its decision insofar as it directs Bellwood to pay attorney fees and costs for the preappeal work.

Kincaid requests this court to additionally award him appellate attorney fees and costs. This court held in *Johnson v. Human Rights Comm'n* (1988), 173 Ill. App. 3d 564, 527 N.E.2d 883, that under the pre-1987 HRA, an award of fees and costs for appellate representation is not authorized. We adhere to that holding, and accordingly, deny Kincaid's request for fees and costs of appellate representation.

For the foregoing reasons, the decision of the Commission is affirmed.

Judgment affirmed.

FREEMAN, P.J., and WHITE, J., concur.