2020 IL App (1st) 191255-U

No. 1-19-1255

Order filed September 22, 2020

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| HANIF ABDUL-KARIM, | ) | Petition for Direct |
| | ) | Administrative Review of a |
| Petitioner, | ) | Decision of the Illinois Human |
| | ) | Rights Commission. |
| v. | ) | |
| | ) | |
| THE HUMAN RIGHTS COMMISSION, THE | ) | No. 2016 SF 3391 |
| DEPARTMENT OF HUMAN RIGHTS, and | ) | |
| HOLLISTER-WHITNEY ELEVATOR CORP.,[1] | ) | |
| | ) | |
| Respondents. | ) | |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

---

[1] We note that petitioner Hanif Abdul-Karim filed a *pro se* direct appeal to this court. In doing so, petitioner incorrectly listed this case's caption as "Hanif Abdul-Karim v. Brian Musholt and Hollister-Whitney Elevator Corp." To avoid confusion, we have chosen to use the correct caption in our disposition, which matches the caption reflected in the record on appeal. For this reason, the caption used in this disposition differs from this case's title as docketed in our records.

¶ 1    *Held*:    The Illinois Human Rights Commission did not abuse its discretion by sustaining the Illinois Department of Human Rights' dismissal of petitioner's discrimination charge.

¶ 2    Petitioner Hanif Abdul-Karim appeals *pro se* from a final order entered by the Illinois Human Rights Commission (Commission) sustaining the Illinois Department of Human Rights (Department) dismissal of his charge of employment discrimination against Brian Musholt and Hollister-Whitney Elevator Corp. pursuant to the Illinois Human Rights Act ("Act") (775 ILCS 5/1-101, *et seq.* (West 2016)).[2] Petitioner alleged that Hollister-Whitney fired him from his job based on his race and after his participation in a protected activity within such a period of time as to raise an inference of retaliatory motivation. The Department dismissed petitioner's charge for lack of substantial evidence. Petitioner appealed to the Commission, and the Commission sustained the Department's decision. Petitioner filed a direct appeal from the Commission's order. We affirm.

¶ 3    Petitioner filed an employment discrimination complaint, alleging that he reported discriminatory harassment on the basis of his race, self-described as "black," by Ronald Lord, his race "white," to Hollister-Whitney, but the behavior continued. He also alleged that he was discharged for discriminatory reasons and for retaliatory reasons.[3] Specifically, he alleged that Lord verbally harassed him daily, by calling him "buckwheat, mayflower, spades, George Jefferson." Petitioner reported the verbal harassment to his lead person Robert "Bobby" Gearhart,

---

[2] The alleged civil rights violations took place in Adams County which means the appeal should have been commenced in the Appellate Court, Fourth District. See 775 ILCS 5/8-111 (West 2018). However, petitioner, the Department, and the Commission have waived any objections to venue. 735 ILCS 5/2-104(b) (West 2018).

[3] Petitioner originally reported he was harassed by "Ronald Lloyd," however in the record and his appellate brief he identifies the man as "Ronald Lord."

his supervisor Sam Hutton, and another supervisor Randy Orr, but the harassment continued.[4] Petitioner also alleged that Lord physically assaulted him[5] and the next night petitioner's employment was terminated but Lord was not. The reason Hollister-Whitney provided for termination was "poor production."

¶ 4 The Department conducted an investigation, which included interviews with petitioner, and employees of Hollister-Whitney. On February 16, 2017, the Department issued a "Final Investigation Report" that summarized several interviews conducted by the Department's investigator, as well as documents submitted to the investigator.

¶ 5 The report reflects that it was uncontested that petitioner was black and worked as a "probationary" General factory helper. "He was considered 'probationary' for the first 90 days of employment before he could become a union member and gain more job security." Petitioner stated he was hired by Hollister-Whitney on October 19, 2015, and worked in the shipping department. His supervisor was Hutton, and Lord was assigned to train petitioner. Lord did not end up training him. Petitioner stated that beginning on October 28, 2015, he was harassed daily by Lord, who called him names like "Buckwheat," "Spades," George Jefferson," and "b***." Lord also locked or hid petitioner's tools and drove his forklift behind petitioner and then honked the horn. Petitioner told Lord to stop harassing him. Because the harassment continued, petitioner complained to Gearhart, Hutton, and Brian Gustison, former plant manager. Petitioner was told to stop talking with Lord but he still had to work in the presence of Lord, who continued to harass

---

[4] Petitioner's original complaint did not provide full names for Gearhart, Hutton, and Orr, however they are contained in the record on appeal.

[5] While petitioner's original complaint did not set forth the date of the alleged physical assault, the record elsewhere indicates that the alleged assault occurred on January 19, 2016.

him. On January 19, 2016, Lord grabbed petitioner by his coat collar, and petitioner defended himself. He complained again about the harassment to Gustison, and petitioner continued to work around Lord. Petitioner was discharged on January 22, 2016, and believes it was because of his race because Hollister-Whitney did not discharge Lord, and he knows of no other employee terminated in a similar manner.

¶ 6    Doug Olson ("white"), human resources manager, was interviewed by the Department and stated that Hollister-Whitney had a policy against harassment, and when an allegation of harassment is made, he conducts an investigation. Petitioner did not complain to him of harassment until after petitioner was discharged. At that time, Olson investigated the claim, and found no evidence to substantiate petitioner's allegations. Lord denied harassing petitioner, no one else heard Lord "calling [petitioner] any names" and there was evidence that petitioner "talk[ed] negatively about Lord's family." Olson explained that Hollister-Whitney takes incidents of racial harassment seriously as evidenced by the discharge of another employee for creating a hostile work environment.

¶ 7    Lord denied harassing petitioner in any way. Lord denied calling him racial names or "b***," locking or hiding petitioner's tools, or driving his forklift behind petitioner and then honking the horn. Lord stated petitioner harassed him, called him "b***" or "dumb a***" and made derogatory references to his wife, kids, and mother. Lord explained that supervisors repeatedly told him and petitioner not to speak with each other, but because Lord was assigned to train petitioner they had to interact. During these interactions, petitioner would harass Lord. Lord told the Department that on January 19, 2016, he moved petitioner's forklift because it was parked and blocking his way. After Lord moved it, petitioner called him "stupid," cursed at him, and

disparaged his wife. He told petitioner to stop, but petitioner continued to disparage Lord's mother. Lord then "kind of 'lost it,' " grabbed petitioner by the collar, and told him to "stop talking like that" and to "leave him alone." Petitioner swung at Lord and knocked his glasses off. As Lord was leaving the area, petitioner hit him on the back of the head. The two were separated for the remainder of their shift.

¶ 8    Hutton told the department investigator he was not present for any of the arguments between Lord and petitioner, but petitioner notified him "a couple times that he and Lord had words." Petitioner did not tell Hutton that Lord had used racial slurs, called him "racial names" and that he felt racially harassed.

¶ 9    Gustison stated to the Department that in early January 2016, petitioner complained to him about Lord's harassment and name calling. Petitioner did not tell Gustison that the name calling involved racial slurs or racial harassment. Gustison spoke with Lord, who made similar complaints about petitioner. Gustison did not know who was telling the truth.

¶ 10    Gearhart told the Department that petitioner spoke to him about Lord calling him names such as "f***" and "c***," but never about any racial names or racial harassment in general. Gearhart had worked with Lord for over two years and had never heard him use the words "f***" and "c***." Gearhart also never heard Lord call petitioner names or see him hide petitioner's tools in the workspace. Gearhart had heard petitioner disparage Lord's family. Gearhart informed petitioner that that type of language was not allowed at Hollister-Whitney.

¶ 11    Olson stated that during the first 90 days of employment a probationary employee may be discharged for any reason. Lord was not a probationary employee, but a full union member with all union rights and protections, whereas petitioner was a probationary employee. Neither Lord

nor petitioner were disciplined for the altercation on January 19, 2016. Olson stated that Lord was not discharged because, unlike petitioner, he did not have repeated poor job performance. Additionally, Hollister-Whitney employed "other race/black employees."

¶ 12 Gustison stated that although physical assault is a legitimate reason for discharge, they could not determine who instigated the altercation on January 19, 2016, and so no action was taken. With regard to petitioner's work performance, Gustison stated that he did not label boxes correctly, pulled product that could have been returned, was not in his area working when he should have been, and took too long to complete his order. Gustison explained that mislabeling the boxes could have cost Hollister-Whitney $1000 to $2500 in profits in a worst-case scenario. While Gustison and others were discussing the altercation between Lord and petitioner, they discovered petitioner had poorly assembled a "skid." Gustison stated that petitioner was discharged for his repeated work performance issues.

¶ 13 Musholt stated that Hollister-Whitney custom built and shipped elevator parts to customers, and that to do so, it requires that each piece of product on the skid have the same number so it is shipped to the right customer. Musholt was aware that petitioner had issues with his work performance in the past and had another problem with a skid after the January 19, 2016, altercation with Lord. They talked about petitioner's work performance and made the determination to discharge him because he was still a probationary employee, who continued to make mistakes. Musholt cited examples of other employees who were discharged due to poor work performance, including David Keller ("white"), former general factory helper, Susan McElwee ("white"), former employee, and Lane O'Donnell ("white"), former general factory helper.

¶ 14    Hutton stated that petitioner placed the product on the skid in a haphazard way, so that it could have fallen off the skid and been damaged. Petitioner also wrote on the product over the sticker number and pulled the wrong product. He also pulled items to ship that were not ready and incorrectly cut templates for hinges and placed them on backward. Hutton talked with petitioner several times about his poor work performance. On January 19, 2016, petitioner pulled product and placed it on a skid in a haphazard way.

¶ 15    The Department investigation included Hollister-Whitney's harassment policy which stated that employees may not engage in conduct which could be viewed as unlawful discrimination or harassment and failure to adhere to this policy may result in termination. The investigation also included documentation of employee statements made by Lord, Hutton, Sprinkle, Orr, Chris Holthaus, and Gearhart.

¶ 16    Lord's written statement was largely the same as his statements to the Department, but included details that petitioner had threatened him by saying that "he [was] going to come see (Lord) when he's ready to leave," and that "he is about ready to become unglued on [Lord]… That he knows that he will lose his job but so will" Lord. Lord stated that on January 19, 2016, after he had moved petitioner's forklift, petitioner called him a "punk b***, a***, a real f***." Lord became so angry that he got out of the forklift, grabbed petitioner and told petitioner to leave him alone. When Lord walked away, petitioner knocked his glasses off and then punched him in the back of the head.

¶ 17    In his statement, Orr said that petitioner came to him on or about January 8, 2016, and informed him that Lord had blocked his work area, and, although petitioner had notified Hutton,

nothing was done about it. Lord told Orr that petitioner was blocking his work area, so he moved things around to be able to work.

¶ 18    Petitioner told the Department that he never informed the management of Hollister-Whitney that Lord was "racially harassing" him. He alleged it should have been obvious based on his and Lord's race. He also denied harassing Lord or insulting his family. Petitioner also averred that although Hollister-Whitney claimed he was being discharged due to "poor work performance," they cited something done on a day of the week that he did not work. He had only been spoken to once for a "red flag" error notification during his probationary period and had corrected the problem. Lord was not discharged after the altercation, and petitioner knows of no other employee terminated in a similar manner.

¶ 19    Documentation presented to the Department showed that petitioner had signed off on an Order form, and three photos were presented "indicating the number on the box label is 'incorrect.' " The Department also received photos of items that were not completely painted. Included in the documentation was an email from Gustison to Orr, Hutton and Sprinkle. The email, dated January 20, 2016, states that petitioner's "employment should be terminated. This is not because of the incident last night. This stems from his inability to complete his job and tasks. We found a skid just today that he scabbed a bunch of wood onto the side to pack governors and tw (sic) on. They were all hanging off and crooked." Petitioner's discharge document showed he was discharged on January 21, 2016, for "poor work performance…[and] was talked to by Corrie E. and Sam H. about his performance."

¶ 20    Petitioner responded to this evidence by stating that he was not in charge of painting items and should not have been held responsible for them. Additionally, petitioner acknowledged that he had one "red flag" error notification that he corrected and was never written up for.

¶ 21    The Department issued a determination finding that Hollister-Whitney followed its probationary employee practice and discharged petitioner only after receiving repeated reports of his poor work performance. Consequently, the Department found no substantial evidence of discharge based on racial animus, or retaliation based on petitioner's complaints of harassment. The Department dismissed petitioner's charge for lack of substantial evidence.

¶ 22    The Department attached a witness list, and list of exhibits to the report. The witnesses included petitioner, Musholt, Olson, Hutton, Lord, Gearhart, and Darmez Cary, who did not speak with investigators. The exhibits included a verified response good cause determination, Hollister-Whitney's Equal Employment Opportunity (EEO) report, petitioner's letter to Illinois Department of Human Services dated-stamped March 1, 2016, Hollister-Whitney's harassment policy, employer witness statements, Gilday's discharge document and harassment photo, photos of petitioner's work items with errors, Gustison's January 20, 2016 email, petitioner's discharge documentation, and the discharge documents for Keller, McElwee, and O'Donnell.

¶ 23    On May 1, 2017, petitioner filed a request for review with the Commission. In the request, he argued that Lord admitted to grabbing him by his coat collar but only petitioner's employment was terminated.

¶ 24    The Department filed a response to petitioner's request for review. In the response, the Department argued that it was proper to dismiss the counts and noted there was no substantial evidence that petitioner was harassed due to his race. The Department also noted that there was no

substantial evidence that petitioner was discharged due to his altercation with Lord, or evidence of pretext in his discharge. Finally, there was no substantial evidence that Hollister-Whitney discharged petitioner in retaliation because there were legitimate non-discriminatory reasons to discharge petitioner "and there was no evidence of pretext."

¶ 25    On May 22, 2019, the Commission sustained the Department's dismissal of petitioner's charge for lack of substantial evidence. The Commission found Hollister-Whitney did not subject petitioner to harassment because he did not notify Hollister-Whitney's management that he was being discriminated against on the basis of race. The Commission found Hollister-Whitney did not discharge petitioner based on his race because petitioner failed to show that he was performing his work satisfactory and that there was a member outside of his protected class that was treated more favorably under similar circumstances. Last, the Commission found there was no retaliation because petitioner did not establish that he was engaged in a protected activity.

¶ 26    On June 21, 2019, petitioner filed a timely petition for direct review of the Commission's decision in this court. See Ill. S. Ct. R. 335(a) (eff. July 1, 2017); 775 ILCS 5/8-111(B)(1) (West 2016) (After the Commission has entered a final order, a complainant may obtain judicial review by filing a petition for review in the Appellate Court within 35 days of the decision.).

¶ 27    On appeal, petitioner reiterates his complaints of racial discrimination and retaliatory discharge because he was verbally abused and harassed nightly, and physically assaulted by Lord, and petitioner's employment was terminated, whereas Lord continues to be employed.

¶ 28    As a preliminary matter, we note that petitioner's appellate brief fails to comply with Illinois Supreme Court Rule 341 (eff. May 25, 2018), which governs the contents of briefs and requires an appellant's arguments to be supported with citations to relevant legal authority and

portions of the record. Without outlining the numerous shortcomings of petitioner's brief, we briefly point out that his brief fails to comply with Rule 341(h) because it does not include a statement of the issues presented for review, a statement of jurisdiction, a section detailing the statutes involved, a statement of facts that references pages of the record, and an argument section that cites to pertinent legal authority. See *Gandy v. Kimbrough*, 406 Ill. App. 3d 867, 875 (2010) (this court is not a depository in which the burden of argument and research may be dumped).

¶ 29 Petitioner's *pro se* status does not relieve him of the responsibility to comply with the appellate procedures established by our supreme court. *Wing v. Chicago Transit Authority*, 2016 IL App (1st) 153517, ¶ 7. Accordingly, we may dismiss an appeal when it "fails to comply with the requirements of Rule 341." *Zale v. Moraine Valley Community College*, 2019 IL App (1st) 190197, ¶ 32. However, we will address petitioner's arguments here because we have the benefit of a cogent brief from the opposing party and it is clear that petitioner challenges the Commission's final order. See *Stolfo v. KinderCare Learning Centers, Inc.*, 2016 IL App (1st) 142396, ¶ 19.

¶ 30 A case under the Act begins when an aggrieved party files a charge in writing with the Department. 775 ILCS 5/7A-102(A)(1) (West 2016). Then the Department investigates to determine if the allegations in the charge are supported by substantial evidence. *Id.* § 7A-102(C)(1). "Substantial evidence is evidence which a reasonable mind accepts as sufficient to support a particular conclusion and which consists of more than a mere scintilla but may be somewhat less than a preponderance." *Id.* § 7A-102(D)(2). The charge will be dismissed if the Department determines that there is no substantial evidence. *Id.* § 7A-102(D)(3). After the dismissal, the complainant may then file a request for review with the Commission. *Id.*

¶ 31 "When a request for review is properly filed, the Commission may consider the Department's report, any argument and supplemental evidence timely submitted, and the results of any additional investigation conducted by the Department in response to the request." *Id.* § 8-103(B). Once the Commission has issued a final order, a petitioner may obtain judicial review by filing a petition for review in the Appellate Court within 35 days of the decision. *Id.* § 8-111(B)(1).

¶ 32 We review the Commission's order under an abuse of discretion standard. *Young v. Illinois Human Rights Comm'n*, 2012 IL App (1st) 112204, ¶¶ 31-33. "Under the abuse of discretion standard, the court should not disturb the Commission's decision unless it is arbitrary or capricious. [Citation.] A decision is arbitrary or capricious if it contravenes legislative intent, fails to consider a critical aspect of the matter, or offer an explanation so implausible that it cannot be regarded as the result of an exercise of the agency's expertise." *Id.* ¶ 33. In applying this standard, we will not "reweigh the evidence" or substitute our judgment for that of the Commission. *Id.* When no reasonable person could agree with the Commission's order there is an abuse of discretion. *Id.*

¶ 33 The Act declares that it is the public policy of Illinois to secure for all individuals freedom from discrimination on the basis of race in connection with employment. 775 ILCS 5/1-102(A) (West 2016). It is a civil rights violation for an employer to engage in harassment, or discharge on the basis of race. 775 ILCS 5/2-102 (West 2020); 775 ILCS 5/1-103(Q) (West 2016). Additionally under the Act it is a civil rights violation to retaliate against a person because he has opposed unlawful discrimination. 775 ILCS 5/6-101 (West 2016).

¶ 34 Racial harassment occurs when there has been a "steady barrage" of racial abuse. *Village of Bellwood Board of Fire and Police Commissioners v. Human Rights Comm'n*, 184 Ill. App. 3d 339, 350 (1989). However, an "employer is not automatically liable for the harassment of its

employees" but will be held liable where it does not respond. *Id.* The Act explains that the employer is responsible if they become aware of the conduct and fail to take reasonable corrective measures. 775 ILCS 5/2-102 (West 2020).

¶ 35 Here, the record shows that although petitioner complained to Hollister-Whitney management, he acknowledged that he never informed them that the harassment towards him was racial in nature. Additionally, there is evidence from Olson that Hollister-Whitney immediately responded and took reasonable corrective measures to harassment in the past. Consequently, where Hollister-Whitney was not aware of the alleged racial discrimination, the Commission did not abuse its discretion by sustaining the dismissal of petitioner's harassment claim.

¶ 36 The Commission also did not abuse its discretion by sustaining the dismissal of petitioner's discharge. The burden is on petitioner to establish a *prima facie* case of employment discrimination by a preponderance of the evidence. *Young*, 2012 IL App (1st) 112204, ¶ 34. "To establish a *prima facie* case of employment discrimination, the employee must first show that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate business expectations; (3) she suffered an adverse employment action; and (4) the employer treated others similarly– situated outside the class more favorably." *Id.* After petitioner has done so, the employer may rebut the presumption of discrimination by articulating a legitimate reason. *Id.* ¶ 36. Petitioner must then show that this reason provided is only pretext. *Id.*

¶ 37 The parties do not dispute that petitioner is a member of a protected class (due to his race) and that he suffered an adverse employment action (termination). However, petitioner has not established a *prima facie* case of employment discrimination because he has not shown that he was meeting his employer's legitimate business expectations as evidenced by his "red flag" notice and

poor work performance. Specifically, the record shows that during his probationary period petitioner pulled the wrong product, wrote on the product over the sticker number and placed product on skids haphazardly. Hutton informed petitioner several times about his poor work performance. Musholt was also aware of petitioner's poor work performance. The record also shows that in his email, Gustison recommended that petitioner be terminated because of his inability to complete his job, citing petitioner's failure to properly prepare a skid.

¶ 38 Furthermore, petitioner has not pointed out anyone who was similarly situated as him that faired better. The comparison to Lord is not appropriate because Lord was a full union member with all union rights and protections and not a probationary employee, who could be discharged for any reason. Additionally, there is no evidence that Lord had similar "red flag" notices at work for poor work performance. There is also no evidence that others similarly situated as petitioner faired better than he did. In fact, Musholt provided three examples of other employees outside of petitioner's protected class who were discharged for poor work performance. Therefore, the Commission did not abuse its discretion in sustaining the dismissal of petitioner's claim of discriminatory discharge.

¶ 39 The final count considered by the Commission was whether petitioner was discharged in retaliation. Here, again the Commission's finding that petitioner was not discharged in retaliations was not against the substantial weight of the evidence. "A *prima facie* case of retaliation is established by showing that (1) the petitioner engaged in a protected activity; (2) the employer committed an adverse act against the petitioner; and (3) a causal connection existed between the protected activity and the adverse act." *Welch v. Hoeh*, 314 Ill.App.3d 1027, 1035 (2000). Hollister-Whitney took an adverse action against petitioner. However, petitioner acknowledged he

did not notify management of Hollister-Whitney that he was being harassed on the basis of his race. Accordingly, he has failed to establish that the adverse action was taken against him because he was engaged in a protected activity where there is no evidence that Hollister-Whitney was aware of the discrimination.

¶ 40    For the above reasons, we conclude that the Commission did not abuse its discretion in sustaining the dismissal of petitioner's complaint.

¶ 41    Affirmed.