NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220321-U

NO. 4-22-0321

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 17, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE CITY OF SPRINGFIELD, ILLINOIS, a Municipal Corporation, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellant, | ) | Sangamon County |
| v. | ) | No. 21MR750 |
| POLICE PROTECTIVE AND BENEVOLENT ASSOCIATION UNIT NO. 5, a Labor Organization, and JAMES FOXX, | ) ) ) | Honorable Jennifer M. Ascher, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Presiding Justice DeArmond and Justice Cavanagh concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The arbitration award reinstating a police officer but effectively imposing a 13-month unpaid suspension did not violate public policy.

¶ 2     Defendant, Springfield patrol officer James Foxx, used an offensive, racially charged phrase in a text conversation with a fellow officer. Following arbitration, the discipline ultimately imposed for this misconduct was a 13-month suspension without pay. Plaintiff, the City of Springfield (City) brought suit seeking to overturn the arbitrator's decision, but the circuit court confirmed it. The City now appeals, arguing that any discipline of Foxx short of termination constitutes a violation of Illinois public policy. For the reasons stated below, we disagree with the City and affirm.

¶ 3                                    I. BACKGROUND

¶ 4    A collective bargaining agreement (CBA) between defendant the Police Protective and Benevolent Association Unit No. 5 (Union), and the City governs the employment and discipline of police officers in the City's police department (Department). With respect to discipline, the CBA states that discipline "shall be progressive and corrective in cases of remediable offenses and shall be designed to improve behavior and not merely punish it. No officer covered by this Agreement shall be suspended, relieved from duty or disciplined in any manner without just cause."

¶ 5    In January 2018, Foxx was hired by the Department. He became a member of the Union and, following his probationary period, he was afforded the protections of the CBA.

¶ 6                    A. Incident Leading to Termination

¶ 7    In February 2020, Foxx and Lawrence Williams, a fellow officer of the Department, were messaging each other while on patrol. Foxx was covering beat 800 in place of Williams, who is black. The two were communicating over the Department's mobile data computer (MDC) system in addition to texting each other on their cellphones throughout the night and early morning. They were engaged in banter and "kidding" about covering one another's assignments. At approximately 2 a.m., Foxx sent a message using the MDC to Williams stating: "I'm going to send you a message via text so it's secure." Williams responded, "lol." The following exchange occurred via text.

"FOXX: You're making me feel like 800's house nigga[.]

WILLIAMS: I don't even know what that means[.]"

Foxx responded by sending Williams a screenshot of the term "house nigga" as defined by urbandictionary.com, which is as follows:

" 'A house slave, the one who is always after the master, the kind of slave that is the closest to the master. The most flexible type of slave.

Nowadays, often used to designate blacks who serve a white like they slaves.

Also see Uncle Tom'

'The house nigga will sell you up the river

So to massa, he'll look bigger

And when ya bet under a rock, he'll slither' ***.' " (Emphasis omitted.) (URBANDICTIONARY, *House Nigga*, Jan. 13, 2005, available at, https://www.urbandictionary.com/define.php?term=House%20Nigga) (last visited January 19, 2023).

¶ 8    Williams did not respond to the message. At the end of their shifts, Foxx and Williams returned their patrol cars to the Department garage. Williams approached Foxx about the messages, saying that he understood what Foxx meant but there was no need to send the text. Foxx apologized to Williams and then sent another apology via text message stating, "My bad man. Didn't think youd [*sic*] take it that way. Weve [*sic*] had banter like this in the past and I didn't think it was that serious." Williams signed a complaint prepared by a commanding officer, resulting in an Internal Affairs Division (IAD) investigation.

¶ 9    In March 2020, the Department issued a notice of charges to Foxx, citing violations of Department general orders, rules of conduct, and the city civil service commission. Specifically, workplace harassment, unbecoming conduct and associations, and knowing violations of rules and orders. Chief of Police Kenneth Winslow issued a final notice of disciplinary action to Foxx, sustaining all charges and discharging Foxx from the Department.

¶ 10                                    B. The Grievance and Arbitration Hearing

¶ 11          The Union filed a grievance asserting that Foxx's termination did not conform with the established tenets of progressive and corrective discipline in the CBA. In January 2021, the matter was submitted to a mutually selected arbitrator, and an arbitration hearing ensued.

¶ 12          At the hearing, Foxx testified that he spent eight years as a military police officer prior to his employment with the City. He stated the military is one of the most diverse organizations in the world, and he never had any "racial issues" while enlisted. He was deployed to Iraq, Afghanistan, and Haiti. Following an honorable discharge from the military, he worked security for a local hospital. Foxx began working as an officer for the Department in January 2018. During his time as an officer, he had a sterling record with no previous reprimands or complaints. Foxx and Williams worked together "almost every day," and they usually ate lunch together while on shift. He and Williams enjoyed a similar relationship to those Foxx had with other members of the Department. They would go on calls together, "backed each other up," and "joked around."

¶ 13          On the night of the incident, Foxx and Williams were "joking" with each other about having to cover the other's assignment. Foxx reviewed the messages on the MDC leading up to the message where he told Williams he would message him on his cellphone. In explaining why he did not want to send the message over the MDC, Foxx stated, "you got to keep it somewhat professional in a professional medium. So if you're going to send someone a little bit of headgear, then, yes, I would just as soon it not be on an official device." He also did not want to continue switching between completing reports and the MDC chat function. He admitted the text messages he sent to Williams violated Department policy. When Williams returned to the Department at the end of the shift, he approached Foxx and said that Foxx did not need to send that "stuff." Foxx stated Williams was laughing and had a smile on his face, but Foxx began to wonder whether he

had offended Williams, as it was weird Williams had "brought it up." Three months prior to this exchange with Williams, Foxx had received additional workplace harassment training.

¶ 14     Foxx detailed two previous incidents where Williams made "racial jokes" and claimed he did not take offense. One occurrence involved a group conversation where officers discussed potential layoffs and who would be the first to be laid off. Williams rolled up his sleeves and began rubbing his arms, stating he would not be laid off while the others likely would be. Foxx believed Williams was implying that he would be retained because of his race. Another incident involved a conversation among officers about going "mudding." Williams jokingly chimed in, saying, "there's too many white people there."

¶ 15     Foxx regarded Williams as a friend and initially did not think the message was outside the bounds of what they had previously "bantered" about. Foxx did not believe the message he sent to Williams was racist. His reasoning was that,

> "Racism is a feeling. It's hatred. It's hateful acts towards someone else.
>
> There was nothing in what I said that intended to be hateful or anything else. I basically said that, as I stated previously, we've had racial jokes between us. Did I cross the line? Absolutely. Do I feel it's racist, what I said? Absolutely not, because I'm not that kind of person. I don't feel that way towards [Williams] or any other black officer in the department. That's just not the way it is."

Foxx testified that if he were reinstated, he would not engage in the same conduct.

¶ 16     Andrew Dodd was the commander of the field office division of the Department. He was advised of the incident and provided with a screenshot of the message Foxx sent to Williams. He filled out an IAD complaint form as the message contained "a clear violation" of

Department policies. Dodd was surprised by the message due to its inappropriate nature and the fact the Department had just completed training on the Department's rules of conduct. He recommended termination of Foxx because he did not "want any members of the department to have to worry about another member using inappropriate language, especially those terms." He also did not believe that "certain members could trust Officer Foxx." Dodd did not believe Foxx's violation of policy was inadvertent.

¶ 17       The Department's deputy chief of investigation, Josh Stuenkel, testified that he participated in the internal investigation and recommended termination of Foxx. He was shocked that an officer in the Department would engage in this conduct and was concerned about the impact on Department operations. During his 20-year tenure with the Department, "race has always been an issue," and an incident of this nature would impact the ability to recruit and retain minority officers. Stuenkel believed it would be detrimental to the Department to reinstate Foxx, as it would be difficult to express to minority officers that "we are opposed to any sort of racism" while still employing Foxx.

¶ 18       Assistant Chief of Police Kenneth Scarlette, who oversaw the Department's IAD, testified that he recommended termination of Foxx based on the egregious nature of the message followed by "doubling down" on the comments by sending the urbandictionary.com definition. Scarlette felt that the messages were irreconcilable with maintaining a harmonious working relationship with the public and those within the Department. He believed the incident was even more egregious based on its temporal relation to training the entire Department received on harassment and discrimination in the workplace. In standing by his decision, Scarlette stated, "The backlash that we face, the protests that are going on, this sort of false narrative that all police

officers are bad, th[at] police officers are racist. That is exactly why that, coupled with everything that has happened, why I stand by my current recommendation.[1]"

¶ 19        Kenneth Winslow was appointed chief of the Department in 2013, and the areas he sought to immediately improve upon were building better relations with the community and increasing recruitment of minority officers. "[A] lot" of the crime in the city, "especially violent crimes," occurred in minority neighborhoods, so the working relationship with members of those communities was imperative to reducing crime. The incident with Michael Brown[2] in Ferguson, Missouri, highlighted the need for police departments across the country to develop stronger community relationships. The Department's expectations of an officer's behavior toward their coworkers and the community they serve are memorialized in the oath of office, code of conduct, general orders, and the Ten Shared Principles. The Ten Shared Principles were the result of a collaboration between the Illinois Association of Chiefs of Police and the National Association for the Advancement of Colored People (NAACP) and adopted into the Department's code of conduct. The principles explicitly reject, among other things, racial discrimination.

¶ 20        Winslow believed that when an individual uses a racial slur, it shows a lack of "cultural competency," "lack of respect," "lack of value," "a moral character flaw," and "that they don't have good common sense." Following the completion of the IAD investigation, all the disciplinary recommendations from the command staff were to terminate Foxx. The termination decision was not a reaction to the death of George Floyd or other national events, but those events

---

[1] On May 25, 2020, George Floyd was killed while in the custody of Minneapolis police. Meredith Deliso, *Timeline: The Impact of George Floyd's Death in Minneapolis and Beyond*, ABC News, April 21, 2021, available at, https://abcnews.go.com/US/timeline-impact-george-floyds-death-minneapolis/story?id=70999322 (last visited Feb. 14, 2023). In the wake of Floyd's death, Minneapolis and the country at large experienced a varying degree of civil unrest. *Id.*

[2] On August 9, 2014, Michael Brown was shot and killed in Ferguson, Missouri, by a member of the local police force. The United States Department of Justice, *Shooting Death of Michael Brown – Ferguson, MO*, 2014, available at, https://www.justice.gov/crs/timeline-event/shooting-death-michael-brown-ferguson-mo (last visited Feb. 14, 2023). Protests over the shooting gripped Ferguson in the following weeks and spread to communities across the country. *Id.*

only served to reaffirm "that we made the right decision." Winslow did not believe that the progressive and corrective remedial punishment clause in the CBA applied to this situation because the conduct was so egregious and not remedial. The messages were racist, intentional, and demonstrated a lack of respect for the Department and its members.

¶ 21 Winslow also summarized a situation where another officer was disciplined for using a racial slur. The officer detained an individual after a foot pursuit, and the individual began calling the officer "the N word with an A on the end of it." The officer requested that the individual not call him "that," but the slur was repeated several more times until the officer "responded back in an unprofessional manner," using the same slur several times. Winslow distinguished the situation, as the officer did not initiate the conversation but instead only responded after being called the slur numerous times. The officer received a written reprimand, additional training, and additional oversight. The disciplinary report for the incident was entered into evidence. The report mirrors the testimony of Winslow but details that there were several members of the community present who observed the officer repeat the slur several times.

¶ 22 Charles Peters, a Springfield police officer and a member of the Springfield Ethical Police Society, which is composed of minority police officers, testified that he found the messages from Foxx to be racist and was personally offended that a fellow officer would engage in such discourse. Although Peters was unaware of any previous inappropriate behavior from Foxx, if required to partner with Foxx on patrol, he would question every move Foxx made in situations involving a minority suspect or victim. Working with Foxx would be akin to being placed in a "hostile work environment."

¶ 23 Cody Sands was an officer with the Department working the same shift as Foxx and Williams. He regarded them both as friends, and the three responded to many calls together.

Foxx exhibited a good work ethic, "actually liked the job," and got along with the other officers. Prior to the incident, there was no indication Foxx was racist, as he was friendly to those he interacted with and treated everyone equally and fair. Sands described an incident where Foxx, Williams, and other officers were gathered in the garage waiting on their squad cars. Sands was explaining that he and other officers were going "mudding" that weekend. Williams responded that the activity was "for white people." This exchange occurred the same night Foxx sent Williams the messages at issue in this matter. Joking around was commonplace in the Department, but the language Foxx used in the messages was "over the top and out of line."

¶ 24    Officer Devin Phillips worked the same shift as Foxx and Williams, and he considered them both to be his friends. Phillips went on the majority of calls with Foxx and found him to be "professional and courteous" to both members of the public and fellow officers. Foxx treated people equally, and Phillips never witnessed him treat black people differently than white people. Phillips was surprised that Foxx sent the messages as it "did not conform to his personality" and believed that if Foxx were reinstated, "he'd be professional and courteous and continue being a great officer." Further, he did not believe Foxx would send messages similar to the ones at issue.

¶ 25    Officer Taylor Staff testified that he responded to calls with Foxx and found him to be professional and courteous. When interacting with officers in the Department, Foxx was "[v]ery easy to get along with, friendly, positive, someone that you wanted to surround yourself with." Staff never noticed anything while on calls that would lead him to believe that Foxx was racist or harbored any prejudice against black people. Foxx's work performance was "very good," as he was one of the most proactive officers in the Department. While Staff was "shocked" that Foxx sent the messages, he believed Foxx would "be a huge asset, certainly beneficial" to the Department if reinstated.

¶ 26     Austin Randolph, the first vice president of the local chapter of the NAACP and member of the National Organization of Black Law Enforcement Executives, testified that he believed the Department's termination of Foxx was appropriate and that, if Foxx was reinstated, "It would be a slap in the face."

¶ 27     Teresa Haley, president of the local chapter of the NAACP, commended Winslow on his performance as chief, as he had tripled the number of black officers in the Department. She further commended Winslow for building trust between the community and the Department and credited his actions, in addition to terminating Foxx, with avoiding the civil unrest gripping the rest of the nation in the wake of the killing of George Floyd. Haley heard about the incident from Williams and other officers. She heard that Williams and Foxx "hangout sometimes" and "horse around," but she found Foxx's comments offensive and harmful.

¶ 28                    C. The Arbitrator's Findings and Award

¶ 29     The arbitrator issued her written findings and award in April 2021, reinstating Foxx without back pay. The arbitrator determined that the City had proven the three charges set out in the notice of charges by clear and convincing evidence and there was just cause for discipline. However, the important inquiry was whether the disciplinary response was appropriate and proportional to Foxx's conduct as required by the CBA.

¶ 30     In analyzing whether the offense was capable of remediation, the arbitrator noted that the incident involved only Foxx and Williams and neither any other officers nor members of the community. The arbitrator found that, "For purposes of this case, the remediable analysis may be broken down into a consideration of three factors: awareness of the wrongful conduct; taking responsibility for one's actions; and a commitment not to repeat the conduct." The arbitrator noted Foxx expressed a commitment not to repeat the complained-of conduct and that he had learned his

lesson. Officer Foxx was aware he had shown poor judgment and took responsibility. He apologized to Williams after having time to contemplate the inappropriateness of the messages.

¶ 31    After considering these factors, as well as the fact that Foxx had no prior discipline or complaints against him, the arbitrator found reinstatement was appropriate under the facts of the case. The award did not grant back pay because the City established that Foxx's violation of Department rules consisted of the "unprovoked use of racial slurs." Foxx was effectively given a 13-month unpaid suspension as punishment for his conduct.

¶ 32                    D. Review in Circuit Court

¶ 33    The City filed a one-count petition to vacate the arbitration award in the circuit court of Sangamon County, arguing that reinstating Foxx would violate the public policy against racial discrimination, bias, and harassment. The petition sought to vacate the award through the judicially crafted, narrow exception to the finality of arbitration awards emanating from collective bargaining agreements known as the public-policy exception.

¶ 34    The circuit court agreed with the City that "there is a well-defined public policy that is ascertainable which prohibits racial discrimination, bias and harassment by police officers in the work place." The court further found, however, that this policy was adequately served by the imposition of a 13-month unpaid suspension. The court found that Foxx's behavior was not condoned and did not go unpunished, and the current CBA did not provide for Foxx's immediate termination. The court noted, "Certainly[,] the City may find it appropriate to bargain for immediate termination of police officers who are found guilty of discrimination, bias and/or harassment but the current [CBA] between the [City] and [Union] does not provide for said immediate termination." The circuit court also noted that neither the Union nor Foxx challenged the arbitrator's modification of Foxx's discipline to a 13-month unpaid suspension.

- 11 -

¶ 35        This appeal followed.

¶ 36                                    II. ANALYSIS

¶ 37        On appeal, the City argues that there is a well-defined public policy against racial discrimination, bias, and harassment that militates against the reinstatement of Foxx. In requiring the City to reinstate Foxx to the Department, the City argues the arbitrator's decision violates public policy and should be vacated pursuant to the public-policy exception. The City also argues that upholding reinstatement violates the public policy of providing effective law enforcement. The Illinois Municipal League (IML) was permitted to submit a brief as *amicus curiae* in support of the City. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 38        Foxx and the Union argue that after reviewing relevant judicial and statutory authority relating to racial discrimination, bias, and harassment, it is apparent the discipline ultimately meted out to Foxx does not violate public policy. They argue that the arbitrator's award must stand.

¶ 39        "It is well established that judicial review of an arbitrator's award is extremely limited and the award must be construed, if possible, as valid." *City of Chicago v. Fraternal Order of Police*, *Chicago Lodge No. 7*, 2020 IL 124831, ¶ 25 (hereinafter *City of Chicago*). This judicial deference is owed to the fact that the parties have bargained to have their disputes settled by arbitration rather than by the courts. *Griggsville-Perry Community Unit School District No. 4 v. Illinois Education Labor Relations Board*, 2013 IL 113721, ¶ 18 (hereinafter *Griggsville-Perry*). Judicial modification of the arbitration award deprives the parties of the benefit of their bargain. *Decatur Police Benevolent & Protective Ass'n Labor Committee v. City of Decatur*, 2012 IL App (4th) 110764, ¶ 21 (hereinafter *Decatur*). In contracting to proceed to arbitration, the parties agree to accept the arbitrator's view of the facts and interpretation of the labor agreement. *Griggsville-*

*Perry*, 2013 IL 113721, ¶ 18. "Thus, a court is duty bound to enforce a labor-arbitration award if the arbitrator acts within the scope of his or her authority and the award draws its essence from the parties' collective-bargaining agreement." *American Federation of State, County & Municipal Employees, AFL-CIO v. Department of Central Management Services*, 173 Ill. 2d 299, 304-05 (1996) (hereinafter *AFSCME*).

¶ 40 Our review of the award is so constrained that reversal is not warranted even when it is shown "the arbitrator 'committed an error—or even a serious error.' " *Griggsville-Perry*, 2013 IL 113721, ¶ 20 (quoting *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, 559 U.S. 662, 671 (2010)); see also *Decatur*, 2012 IL App (4th) 110764, ¶ 21 (noting a court may not set aside an arbitration award because of judgment errors or a mistake of law or fact). Accordingly, we have " ' " no business weighing the merits of the grievance." ' " *Griggsville-Perry*, 2013 IL 113721, ¶ 18 (quoting *United Paperworkers International Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 37-38 (1987), quoting *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 568 (1960)).

¶ 41 Nonetheless, the judiciary has crafted an extremely narrow exception to the exceedingly limited circumstances where a court of review can vacate an award. *City of Chicago*, 2020 IL 124831, ¶ 25. "Under the public-policy exception, if an arbitration award is derived from the essence of the collective-bargaining agreement, this court will vacate the award if it 'is repugnant to established norms of public policy.' " *Id.* (quoting *AFSCME*, 173 Ill. 2d at 307). This judicially crafted exception only warrants application "when a party clearly shows enforcement of the contract, as interpreted by the arbitrator, contravenes some explicit public policy." *Id.*

¶ 42 Our review of a challenge to an arbitral award under the public-policy exception requires a two-step process. *Id.* ¶ 26. We first determine "whether a well-defined and dominant

public policy can be identified." *AFSCME*, 173 Ill. 2d at 307. To ascertain public policy, we "look to our 'constitution and *** statutes, and when cases arise concerning matters upon which they are silent, then in its judicial decisions and the constant practice of the government officials' when determining questions regarding public policy." *Id.* (quoting *Zeigler v. Illinois Trust & Savings Bank*, 245 Ill. 180, 193 (1910)). The existence of a public policy may not rest on "general considerations of supposed public interests" (*W.R. Grace & Co. v. Local Union 759, International Union of United Rubber, Cork, Linoleum & Plastic Workers of America*, 461 U.S. 757, 766 (1983)) or a mere value judgment "that implicitly forbids the employee's reinstatement" (*City of Highland Park v. Teamster Local Union No. 714*, 357 Ill. App. 3d 453, 462 (2005) (hereinafter *Highland Park*)).

¶ 43       If a party succeeds in carrying its burden in the first step, the second step is to determine "whether the award of the arbitrator, resulting from his or her interpretation of the agreement, violates public policy." *Decatur*, 2012 IL App (4th) 110764, ¶ 24. "Because our inquiry is whether the arbitrator's construction of the CBA, as reflected in [the] award, is unenforceable due to a predominating public policy, which is a question of law, our review is *de novo*." *City of Chicago*, 2020 IL 124831, ¶ 26. We now turn to the first step in our review.

¶ 44                    A. Well-Defined and Predominant Public Policy

¶ 45       The circuit court found that the City established the existence of a well-defined public policy against racial discrimination, bias, and harassment. The Union does not expressly concede the existence of this public policy, but neither does it contest it. Indeed, a review of our constitution and statutes reveals the existence of this well-defined and predominant public policy. See Ill. Const. 1970, art. I, § 20 ("To promote individual dignity, communications that portray criminality, depravity or lack of virtue in, or that incite violence, hatred, abuse or hostility toward,

- 14 -

a person or group of persons by reason of or by reference to ***, racial, *** affiliation are condemned."); 775 ILCS 5/1-102(A) (West 2020) (Illinois Human Rights Act declaration of public policy against discrimination based on, among other things, race); 42 U.S.C. § 2000e-2 (2020) (prohibiting employment discrimination based on race); 720 ILCS 5/12-7.1(a) (West 2020) (section of Illinois Criminal Code of 2012 providing for punishment of conduct as a hate crime following "transmission of obscene messages, harassment by telephone, or harassment through electronic communications *** " when race was a motivating factor). The City argues another public policy, that of a safe workplace free from explicit racial harassment and discrimination, is supported by many of the same authorities cited above. In its argument, the City combines this policy and the policy against racial discrimination, bias, and harassment to argue that the award is violative of the combined policies. We address the argument as presented.

¶ 46 Additionally, the City asserts there is a strong public policy in favor of providing effective law enforcement. Likewise, the IML also advances substantially the same policy of having laws effectively enforced by a professional, responsive, respectful, and trustworthy police force. Policy favoring effective law enforcement is found in the Civil Administration Code of Illinois (20 ILCS 2605/2605-200(a)(1)-(6) (West 2020)), the Citizens Participation Act (735 ILCS 110/5 (West 2020)), and the Illinois Uniform Conviction Information Act (20 ILCS 2635/2(B) (West 2020)). See also *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 132 (1981). Based on these authorities, we agree providing effective law enforcement is a well-defined and predominant public policy, and that internecine racial strife between officers may jeopardize

effective policing. Accordingly, we address the question of whether the award would run afoul of this public policy below.[3]

¶ 47                                    B. Arbitration Award Versus Public Policy

¶ 48          The foregoing public policies having been established, we next turn to the question of whether termination of Foxx is necessary to avoid infringing upon them. We begin by noting that we share the City's genuine concern over the offensive term used by Foxx in this case, and we agree that its use was flatly inappropriate. It finds its roots in the shameful history of slavery, and it remains a flash point for division in our society. See Cherry Wilson, *N-word: The troubled history of the racial slur*, BBC News Online, Oct. 5, 2020, available at https://www.bbc.com/news/stories-53749800 (last visited Feb. 14, 2023). The use of such a term will almost certainly always trigger concerns about the public policy against racial discrimination, bias, and harassment. The question here, however, is not whether Foxx's words contravene the important public policies noted above, but whether the measure of discipline meted out to him does. The irreducible crux of the position taken by the City and the IML is that the *only* adequate discipline for a single utterance of the word is termination.

¶ 49          There are several cases that apply the public-policy exception in a situation where a public employer argues that termination is required to satisfy an important public policy. See, *e.g.*, *AFSCME*, 173 Ill. 2d at 333 (finding termination was required for child welfare worker who falsely reported observation of children); *American Federation of State, County & Municipal Employees, AFL-CIO v. State*, 124 Ill. 2d 246 (1988) (holding discharge not required for mental health employees who neglected their duty to supervise care home residents); *Highland Park*, 357

---

[3] The IML presents additional public policies and arguments not advanced by the City, but as *amicus curiae*, the IML is confined to arguing the issues as framed by the parties. *In re J.W.*, 204 Ill. 2d 50, 73 (2003); *People v. P.H.*, 145 Ill. 2d 209, 234 (1991).

Ill. App. 3d at 454 (finding termination not required for a police officer convicted of criminal trespass to a vehicle). These cases illustrate that the issue here is not whether Foxx was subject to discipline, but whether any discipline short of termination would violate an important public policy.

¶ 50          1. *Policy Against Racial Discrimination, Bias, and Harassment in the Workplace*

¶ 51          The City argues that it is impossible for it and the Department to claim that "they do not tolerate racial harassment in the workplace while employing an officer who has exhibited those qualities." The IML argues that by accepting Foxx's *ex post facto* justifications and rationalizing his conduct, the award minimizes society's overriding interest in preventing similar conduct from occurring as it sends a message that poor judgment, among other things, renders the conduct permissible or excusable.

¶ 52          In support of its argument, the City cites *Village of Bellwood Board of Fire & Police Commissioners v. Human Rights Comm'n*, 184 Ill. App. 3d 339 (1989) (hereinafter *Village of Bellwood*). In that case, a discharged police officer filed a charge of racial harassment and discrimination pursuant to the Illinois Human Rights Act. *Id.* at 350. During his initial year of probationary employment, the officer was subjected to "a continuous stream of racially derogatory comment[s], in one form or another, from the officers at the Bellwood police department." *Id.* at 351. Supervising officers were aware of the conduct "but took no action to correct it, and, in fact, on some occasions contributed to it." *Id.* The court explained that racial harassment had been defined to include "a steady barrage of opprobrious racial comment" and required more than a few isolated incidents. *Id.* at 350.

¶ 53          We agree that *Village of Bellwood* supports the existence of a public policy against racial discrimination and harassment in the workplace, but the existence of the policy has already

been discussed and is not the relevant issue at this stage of the analysis. The question now is whether Foxx's discipline, specifically the failure to terminate him, constitutes a violation of public policy. In this respect, *Village of Bellwood*—which involved neither employee discipline nor arbitration—is not terribly helpful.

¶ 54 Furthermore, if the City's citation of *Village of Bellwood* is intended to support the contention that Foxx's termination is necessary to address conduct that would constitute workplace harassment, the facts of that case do not support that argument because the isolated use of a racial epithet is insufficient to establish racial harassment in the workplace. See *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (noting mere utterance of an epithet which engenders offensive feelings in an employee is insufficient to implicate Title VII of the Civil Rights Act of 1964 (42 U.S.C § 2000e *et seq.* (1988 ed. Supp III))); *Thornton*, Ill. Hum. Rts. Comm'n Rep. 2015CA0888, at *2 (March 6, 2019) ("In order to prevail on a claim of harassment, Petitioner must establish that the [complained-of] conduct was motivated by discriminatory intent and that Petitioner was subjected to a pattern of incidents that were so pervasive that it constituted a different term and condition of employment based upon a discriminatory factor.").

¶ 55 Even if the singular use of a racial slur were sufficient to establish racial harassment in the workplace—and caselaw makes clear that it does not—the Illinois Human Rights Act only requires an employer with knowledge of the offending conduct "to take reasonable corrective measures." 775 ILCS 5/2-102(A) (West 2020). The City took corrective action, and ultimately that action resulted in a 13-month unpaid suspension. It can hardly be said that the City let the incident pass without taking reasonable corrective measures.

¶ 56    The City also cites *Hardeway v. City of Chicago*, 91C0041, 1991 WL 203857 (N.D. Ill. Oct. 4, 1991), stating, "the use of racial slurs supports an inference of racial animus." In our view, this argument is transparently a disagreement with the arbitrator's factual conclusions dressed in the robes of "public policy" considerations. Inferences are properly considered by the finder of fact, and it appears here that the arbitrator—who characterized the comment as a "thoughtless act"—did not find that Foxx's comments reflected racial animus. By ordering Foxx's reinstatement, the arbitrator also clearly rejected the contention that the misconduct was not remediable. The public-policy exception to the presumed validity of arbitration awards is a narrow one, and it demands a clear showing the award contravenes an explicit public policy. *Decatur*, 2012 IL App (4th) 110764, ¶ 23. The exception is not an avenue to review the factual findings of the arbitrator on appeal.

¶ 57    The IML suggests that the rationalizations used by the arbitrator to explain Foxx's behavior are similar to those in *State v. AFSCME, Council 4, Local 387, AFL-CIO*, 747 A.2d 480, 485 (Conn. 2000). In that case, a correctional officer used an office phone during working hours to anonymously leave a profane and racist voicemail message to a legislator.[4] *Id.* at 482. The officer was terminated and arrested for violating a state anti-harassment law. *Id.* An arbitration award reinstated the officer following a 60-day unpaid suspension, and the state filed a complaint in the circuit court seeking vacatur. *Id.* The circuit court vacated the award for violating public policy, finding anything less than termination was insufficient and that the arbitrator "attempted to excuse [the officer's] conduct 'as the outgrowth of various personal stressors,' " even though he admitted to leaving the message. *Id.* at 484, 486. The Connecticut Supreme Court affirmed as it was "hard to imagine a more repugnant message," and it concluded that the message violated

---

[4] In pertinent part, the voicemail stated, "Who the fuck are you to call [me] a criminal you fucking cock-sucking crack-fucking n***." *Id.* at 482 n.3.

statute and regulations. *Id.* at 486-87. The court also agreed the arbitrator minimized the societal interest in preventing such conduct but rejected the circuit court's assertion that anything less than termination was insufficient. *Id.* at 486. The court went on to find that violation of a criminal statute is not a *per se* "public policy violation sufficient to justify vacating an arbitrator's award." *Id.*

¶ 58    A cursory review of the conduct in the case advanced by the IML and the conduct in this case reveals that the matters are significantly distinguishable. While the Connecticut Supreme Court found the conduct was a "blatant example" supporting termination, the court refused to issue "a generic endorsement of termination in all such cases." *Id*. Rather, judgments invoking the public policy exception needed to be based on the totality of the circumstances. See *id.* Foxx was not charged with a crime, and his conduct pales in comparison to that of the correctional officer. Further, the arbitrator accepted Foxx's testimony that there was no racist intent in sending the messages and found it to be a "thoughtless act," and the City presented little evidence to support a contrary conclusion. Based on the evidence presented and the stark factual difference between this matter and the case relied on by the City and the IML, we conclude that the arbitrator's ruling does not amount to an inherent rationalization of the conduct.

¶ 59    We find that the City has failed to carry its burden to show that reinstatement of Foxx following a 13-month unpaid suspension violates the public policy against racial discrimination, bias, and harassment.

¶ 60                2. *Policy Providing for Effective Law Enforcement*

¶ 61    The City also makes a cursory argument that reinstatement of Foxx is violative of the public policy favoring effective law enforcement. In doing so, the City's argument becomes difficult to distinguish from its argument based on the policy against racial discrimination, bias, and harassment. The additional aspect of this argument is the factually unsupported contention that

Foxx cannot be trusted to refrain from uttering racial slurs to members of the community while on duty and that his conduct calls into question his ability to provide effective law enforcement.

¶ 62    There is an absence of evidence that Foxx has been anything but professional with members of the community in dispensing his duties as an officer. The proper forum to have developed a factual basis for these claims was in arbitration, but the City failed to do so. Moreover, both the City and the Union agreed under the CBA to accept the arbitrator's findings of facts. The unrebutted testimony in front of the arbitrator was that, outside of this incident, Foxx was professional, courteous, and fair, and he treated members of the community equally. The City failed to establish Foxx's conduct was based on racial animus and instead pursued a theory resting on the argument that his conduct was *per se* terminable. The arguments raised by the City on this point rely on mere speculation and assumption, and "[a] refusal to enforce an award must rest on more than speculation or assumption." *Misco*, *Inc.*, 484 U.S. at 44.

¶ 63    The IML cites a litany of law review articles, news articles, and government agency publications for the proposition that Foxx's reinstatement will erode community trust in the Department and send the message that the use of a racist slur is not a terminable offense. But the City seems to recognize that whether the public policy is violated in a particular case is a fact-specific inquiry, and such generalized sources are unlikely to be helpful. Furthermore, the materials relied upon are not clearly tied to the articulated public policy at issue.

¶ 64    The City and the IML rely on statutory authority to establish the policy favoring effective law enforcement, but the IML's argument that the award violates this policy consists of law review articles and secondary sources without explaining how reinstatement would contravene statutes establishing this policy. See *Henderson v. Foster*, 59 Ill. 2d 343, 347-48 (quoting *Harding v. American Glucose Co.*, 182 Ill. 551, 615 (1899)) (" 'When the legislature speaks upon a subject

upon which it has the constitutional power to legislate, public policy is what the statute passed by it indicates.' "). Nonetheless, the authorities cited by the IML set forth several factors important to the "legitimacy underpinning the relationship between law enforcement and the community it protects," such as "politeness, helpfulness and fairness." Conduct detrimental to this legitimacy in the eyes of the community, such as discrimination, can have drastic impacts when community members "have been victims of illegitimate conduct." Again, as the arbitrator pointed out when the City made this very same argument, the incident was between two members of the Department, not Foxx and a member of the community. The unrebutted testimony at arbitration established that Foxx was professional, courteous, and fair in performing his duties. Outside of this incident, there is no evidence of racial animus that the City brought to the arbitrator's attention. Foxx's conduct does not even begin to approach the extreme examples the City and IML cite as support. The cases advanced recognize what is fundamental to decisions under the public-policy exception: context matters. While the comments were offensive, the context of the exchange, as established at arbitration, does not demonstrate corrective discipline will be unavailing.

¶ 65        The City urges that any outcome short of Foxx's termination will send the message that the use of a racist slur is not a terminable offense. We reject the contention that our ruling establishes the policy that use of racial slurs can *never* be a terminable offense, only that it need not *always* be so—a conclusion with which the City previously appears to have agreed. The arbitrator already heard of an incident where another officer of the Department used a racial slur with a member of the public and only received a written reprimand, additional training, and oversight. Based on this previous incident, the City's own conduct appears to recognize that use of a racial slur—even in front of members of the community, which did not occur here—is not a

*per se* terminable offense. Instead, the City administered discipline based on context, an approach which we find eminently reasonable.

¶ 66        The IML also argues that reinstatement of Foxx will hinder other officers of the Department in performing their duties. This contention is unsupported, as the unrebutted testimony of officers who worked with Foxx revealed no such concerns. Peters testified that he would not be able to "trust" Foxx if partnered with him, but Peters never worked with Foxx and was unaware of any misconduct by Foxx in dispensing his duties as an officer. The remaining arguments on this point consist of speculation and rely on hearsay testimony, such as the IML's argument that reinstatement "could" result in community backlash. Again, speculation and assumption do not present the kind of clear violation of a public policy that is necessary to vacate the award. *Misco, Inc.*, 484 U.S. at 44.

¶ 67        Both the City and the IML advance their arguments that reinstatement violates public policy without acknowledging that "the reinstatement of an employee who has violated an important public policy does not necessarily itself violate public policy." *Highland Park*, 357 Ill. App. 3d at 462. Foxx received an unpaid 13-month suspension, and the notion that the "lenient nature of the penalty would encourage additional misbehavior from other officers when beneficial" is unconvincing. The punishment encourages moderation of racially charged language by demonstrating it has no place in society. To that end, it does not encourage the behavior and is likely to deter future acts. The City has failed to clearly establish that the award in this case violates public policy.

¶ 68        We agree with the circuit court that the City may find it appropriate to bargain for immediate termination of officers that engage in conduct similar to Foxx's, however, the current

CBA does not provide for that remedy. Rather, the arbitrator found Foxx was not irredeemable and the tenets of progressive discipline were appropriate.

¶ 69    Our decision should not be construed as an endorsement of Foxx's behavior. The messages Foxx sent to Williams were offensive and demeaning. We do not condone the conduct and only find that under the circumstances presented, the City failed to establish that the arbitrator's imposition of a 13-month unpaid suspension and reinstatement to the Department violates public policy.

¶ 70                                III. CONCLUSION

¶ 71    We agree with the City that officer Foxx's conduct here, though isolated, is plainly deserving of the severe discipline meted out to him following the arbitration process. We cannot agree with the City, however, that the arbitrator's decision violates public policy because it did not go further and require termination. The City is bound by the result of the arbitration process to which it contractually agreed. Consequently, we affirm the circuit court's judgment.

¶ 72    Affirmed.